Argued and submitted May 3, 1999, affirmed as modified January 12, 2000

## D. S. PARKLANE DEVELOPMENT, INC.,
The Halton Company, Edward H. Halton, Jr.,
Department of Agriculture,
Department of Transportation,
Department of Land Conservation and Development,
City of Hillsboro,
Elizabeth Graser-Lindsey,
Coalition for a Livable Future,
Ecumenical Ministries of Oregon,
1000 Friends of Oregon,
and Malinowski Farms,
*Petitioners - Respondents - Cross-Respondents,*

*and*

## CITY OF LAKE OSWEGO
and City of West Linn,
*Respondents - Cross-Petitioners,*

*and*

## WASHINGTON COUNTY FARM BUREAU,
Oregon Farm Bureau Federation,
and John R. Skourtes, et al,
*Respondents - Cross-Respondents,*

*v.*

## METRO,
Genstar Land Company NW,
Sisters of St. Mary's of Oregon,
and Jim Standring,
*Petitioners - Cross-Respondents,*

*and*

## Joseph E. HANAUER,
*Respondent - Cross-Petitioner,*

*and*

## HERITAGE HOMES INVESTMENT CO. CORP.,
Metropolitan Land Company,
and Jerry Parmenter,
*Respondents - Cross-Respondents.*

(LUBA Nos. 97-048, 97-050, 97-052, 97-053,
97-054, 97-055, 97-057, 97-063; CA A105688)

994 P2d 1205

Timothy R. Volpert argued the cause for petitioner - respondent - cross-respondent D. S. Parklane Development, Inc. With him on the briefs were Gregory S. Hathaway, E. Michael Conners, and Davis Wright Tremaine.

David B. Smith argued the cause and filed the briefs for petitioners - respondents - cross-respondents The Halton Company and Edward H. Halton, Jr.

Celeste J. Doyle, Special Assistant Attorney General, argued the cause for petitioners - respondents - cross-respondents Department of Agriculture, Department of Transportation, and Department of Land Conservation and Development. With her on the briefs were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, John T. Bagg, Assistant Attorney General, and Richard M. Whitman, Assistant Attorney General.

Corinne C. Sherton argued the cause for petitioner - respondent - cross-respondent City of Hillsboro. With her on the briefs was Johnson & Sherton, P. C.

Petitioner - respondent - cross-respondent Elizabeth A. Graser-Lindsey, Ph.D., filed the briefs *pro se*.

Mary Kyle McCurdy argued the cause and filed the briefs for petitioners - respondents - cross-respondents Coalition for a Livable Future, Ecumenical Ministries of Oregon, 1000 Friends of Oregon, and Malinowski Farms.

Jeffrey G. Condit argued the cause for respondents - cross-petitioners City of Lake Oswego and City of West Linn. With him on the brief was Miller, Nash, Wiener, Hager & Carlsen LLP.

Steven M. Claussen and Williams, Fredrickson & Littlefield, P.C., filed the brief for respondents - cross-respondents Washington County Farm Bureau and Oregon Farm Bureau Federation.

Richard T. Perry filed the brief for respondent - cross-respondent John R. Skourtes, et al.

Lawrence S. Shaw argued the cause for petitioner - cross-respondent Metro. With him on the briefs were Daniel B. Cooper and Kenneth D. Helm.

Jeff H. Bachrach argued the cause for petitioners - cross-respondents Genstar Land Company NW and Sisters of St. Mary's of Oregon. With him on the briefs was Ramis Crew Corrigan & Bachrach LLP.

Mark J. Greenfield argued the cause and filed the briefs for petitioner - cross-respondent Jim Standring.

Jason D. Miner, Jack L. Orchard, and Ball Janik LLP filed the brief for respondent - cross-petitioner Joseph E. Hanauer.

No appearance for respondents - cross-respondents Heritage Homes Investment Co. Corp., Metropolitan Land Company, and Jerry Parmenter.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

DEITS, C. J.

## DEITS, C. J.

Petitioners and cross-petitioners seek review of LUBA's decision remanding Metro's designation of urban reserve areas for the Portland metropolitan region. We modify the decision and affirm it as modified.

The designation of urban reserve areas is governed by the Land Conservation and Development Commission's (LCDC) urban reserve rule, codified at OAR 660-021-0000 *et seq.* (the rule). The general objective of the rule is to provide for the planning of future expansions of urban growth boundaries (UGBs) through the designation of urban reserve areas that are next to existing UGBs, that are "to be protected from patterns of development which would impede" their eventual urbanization, OAR 660-021-0000, and that will eventually "be included within [the UGBs] before inclusion of other lands." OAR 660-021-0060(1).

The focus of this case and of the many disputes among the parties is OAR 660-021-0030, which sets out the methods and priorities for the designation of the lands that are to comprise the urban reserve areas. It provides:

"(1) Urban reserve areas shall include an amount of land estimated to be at least a 10-year supply and no more than a 30-year supply of developable land beyond the time frame used to establish the urban growth boundary.

"(2) Inclusion of land within an urban reserve area shall be based upon factors 3 through 7 of Goal 14 and the criteria for exceptions in Goal 2 and ORS 197.732. Cities and counties cooperatively, and the Metropolitan Service District for the Portland Metropolitan Area Urban Growth Boundary, shall first study lands adjacent to the urban growth boundary for suitability for inclusion within urban reserve areas, as measured by Factors 3 through 7 of Goal 14 and by the requirements of OAR 660-004-0010. Local governments shall then designate for inclusion within urban reserve areas those suitable lands which satisfy the priorities in section (3) of this rule.

"(3) Land found suitable for an urban reserve may be included within an urban reserve area only according to the following priorities:

"(a) First priority goes to lands adjacent to an urban growth boundary which are identified in an acknowledged comprehensive plan as exception areas or nonresource land. First priority may include resource land that is completely surrounded by exception areas unless these are high value crop areas as defined in Goal 8 or prime or unique agricultural lands as defined by the United States Department of Agriculture;

"(b) If land of higher priority is inadequate to accommodate the amount of land estimated in section (1) of this rule, second priority goes to land designated as marginal land pursuant to ORS 197.247;

"(c) If land of higher priority is inadequate to accommodate the amount of land estimated in section (1) of this rule, third priority goes to land designated as secondary if such category is defined by Land Conservation and Development Commission rule or by the legislature;

"(d) If land of higher priority is inadequate to accommodate the amount of land estimated in section (1) of this rule, fourth priority goes to land designated in an acknowledged comprehensive plan for agriculture or forestry, or both. Higher priority shall be given to land of lower capability as measured by the capability classification system or by cubic foot site class, whichever is appropriate for the current use.

"(4) Land of lower priority under section (3) of this rule may be included if land of higher priority is found to be inadequate to accommodate the amount of land estimated in section (1) of this rule for one or more of the following reasons:

"(a) Specific types of identified land needs including the need to meet favorable ratios of jobs to housing for areas of at least 100,000 population served by one or more regional centers designated in the regional goals and objectives for the Portland Metropolitan Service district or in a comprehensive plan for areas outside the Portland area, cannot be reasonably accommodated on higher priority lands; or

"(b) Future urban services could not reasonably be provided to the higher priority area due to topographical or other physical constraints; or

"(c) Maximum efficiency of land uses within a proposed urban reserve area requires inclusion of lower priority lands in order to include or to provide services to higher priority lands.

"(5) Findings and conclusions concerning the results of the above consideration shall be included in the comprehensive plans of affected jurisdictions."[1]

---

[1] Hereafter in this opinion, we will sometimes refer to the various provisions in OAR 660-021-0030 preceded only by the word "subsection," without setting forth the entire citation of the section.

A number of terms and citations that appear in OAR 660-021-0030 will become relevant to the discussion. The term "adjacent" lands is defined in OAR 660-021-0010(6) as "[l]ands either abutting or at least partially within a quarter of a mile of [a UGB]."

The seven factors in Goal 14 regulate the establishment and amendment of UGBs. Factors 3 to 7, to which OAR 660-021-0030(2) refers, are known as the "locational factors" and require consideration of:

"(3) Orderly and economic provision for public facilities and services;

"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5) Environmental, energy, economic and social consequences;

"(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI being the lowest priority; and

"(7) Compatibility of the proposed urban uses with nearby agricultural activities."

Although OAR 660-021-0030(2) refers generally to OAR 660-004-0010, LUBA and the parties appear to agree that the only provision of the latter rule that is relevant here is subsection (1)(c)(B). It provides:

"When a local government changes an established urban growth boundary it shall follow the procedures and requirements set forth in Goal 2 'Land Use Planning', Part II, Exceptions. An established urban growth boundary is one which has been acknowledged by the Commission under ORS 197.251. Revised findings and reasons in support of an amendment to an established urban growth boundary shall demonstrate compliance with the seven factors of Goal 14 and demonstrate that the following standards are met:

"(i) Reasons justify why the state policy embodied in the applicable goals should not apply (This factor can be satisfied by compliance with the seven factors of Goal 14.);

"(ii) Areas which do not require a new exception cannot reasonably accommodate the use;

"(iii) The long-term environmental, economic, social and energy consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and

"(iv) The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."

We quote the section of LUBA's opinion that sets forth the factual background and describes the way that Metro applied the urban reserve rule in making its designation of urban reserve areas:

"Metro is a special district that functions as a regional government for the metro region, with exclusive jurisdiction over the metro UGB and consequently the UGBs of cities within its district boundaries. In 1991, Metro adopted Regional Urban Growth Goals and Objectives (RUGGOs) in order to provide regional land use policy direction for the metro region consistent with the statewide planning goals. RUGGOs are directly applicable only to Metro; city and county plans must comply with RUGGOs only when they are implemented by Metro in its more detailed functional plan provisions.

"In 1995, the RUGGOs were amended to add Goal 11.4, the Metro 2040 Growth Concept (2040 Concept). The 2040 Concept text and map constitute an integrated set of goals and objectives for the region, designed to achieve a desired urban form by the year 2040. Accompanying the 2040 Concept was the 'Region 2040 Recommended Alternative Technical Appendix,' which contains background data used by Metro to estimate the density and capacity of the region in developing the 2040 Concept. Metro implemented the 2040 Concept in part by developing the Urban Growth Management Functional Plan (UGM Functional Plan), which Metro adopted November 21, 1996. To implement the 2040 Concept, the UGM Functional Plan sets certain 'target capacities' and requires, among other things, that local governments take specific measures to increase residential density within their respective UGBs to meet those target capacities.

"The 2040 Concept estimates that the Metro UGB will need to accommodate an additional 359,653 households and 561,800 jobs by the year 2040. The UGM Functional Plan estimates that, if the target capacities are achieved, the current [M]etro UGB can accommodate an additional 243,600 households and 461,633 jobs by the year 2017.

---

OAR 660-021-00030(2) *also* incorporates "the criteria for exceptions in Goal 2 and ORS 197.732." At least as far as relevant here, there is no material difference between the exceptions criteria in those provisions and the standards in OAR 660-004-0010(1)(c)(B).

Metro used these estimates as the starting point for determining how many acres of land Metro needed to designate as urban reserves, pursuant to Subsection 1 of the urban reserve rule.

"Metro then proceeded to determine the suitability of adjacent lands, pursuant to Subsection 2 of the urban reserve rule. Metro first engaged in a pre-screening process that eliminated certain adjacent lands from consideration without formal study. On February 8, 1996, Metro designated for suitability study 72 urban reserve study areas (URSAs), containing approximately 23,500 acres adjacent to or within two miles of the metro UGB. At that time Metro expected that approximately 14,500 acres would ultimately be needed for designation as urban reserves. The boundaries of each URSA were generally drawn to correspond to topographic features, such as roads or watersheds, and did not usually conform to tax lot or zoning boundaries. As a result, most URSAs included a mix of resource and exception lands. The size of each URSA varied greatly, from as few as 10 acres to as many as 2,166 acres.

"To help study the suitability of land within each URSA for inclusion in urban reserves, and the relative suitability of each URSA compared to other URSAs, Metro developed a study model which * * * has become known as 'URSA-matic.' URSA-matic is a computer program that examines various subfactors for each of the five locational factors of Goal 14, assigns numeric scores for each subfactor and factor, and performs computations with those scores, resulting in a composite score that ranks the suitability of each URSA. The subfactors are not an express part of the Goal 14 factors; Metro developed them as a means to measure the suitability of lands for inclusion in urban reserves.

"In March 1996, shortly after Metro designated for study the lands within the 72 URSAs, Metro planning staff completed a draft planning document known as the Urban Growth Report (draft Report). The draft Report is an updated version of the data used to develop the 2040 Concept, containing 20-year population, employment and housing forecasts designed to determine whether the [M]etro UGB has a 20-year supply of land, as required by ORS 197.296. The draft Report estimates that the existing UGB does not have a 20-year supply of land. More specifically, the draft Report estimates that the existing UGB has a capacity of 206,600 households through the year 2017, but

that housing need in 2017 will be 248,000, for a deficit of 41,400 dwelling units. That figure is different from the capacity figures in the UGM Functional Plan, which estimates that, if target capacities are achieved, the current UGB can accommodate approximately 243,600 households by 2017, or 37,000 more households than the draft Report estimates.

"In September 1996, the Metro Executive Officer recommended that the Metro Council designate approximately 14,000 acres as urban reserves to meet year 2040 urban land needs. The Executive Officer's recommendation was based on the UGB capacity estimates in the UGM Functional Plan. In December 1996, the Metro Council rejected that recommendation, and chose to apply the lower estimate of UGB capacity contained in the draft Report. Accordingly, the Metro Council revisited the initial Subsection 1 estimate of urban land need, and estimated that the land need for urban reserves to 2040 at approximately 18,300 acres.

"During work sessions in December 1996, the Metro Council changed the boundaries of a number of URSAs to remove certain lands and to add others, with a net effect of reducing the number of acres under consideration to 20,049. The Metro Council then ordered a reanalysis of the URSA-matic factors to account for the new boundaries and to correct for two computational errors in the initial analysis.

"Under the URSA-matic reanalysis, each of the 72 URSAs was generally considered 'suitable' for inclusion in urban reserves. Because the 72 URSAs contained more acreage than needed to satisfy the estimated urban land need, the Metro Council set a 'minimum qualifying score' of 33 or above, and excluded from further consideration those URSAs that fell below that score. In addition, at some point the boundaries of all URSAs were redrawn to make those boundaries conform to tax lot lines, by including inside the URSA tax lots that were mostly within the URSA boundaries, and by excluding tax lots that were mostly outside the URSA boundaries.

"The Metro Council then made final designations of land into urban reserves pursuant to Subsections 3 and 4. The Council designated approximately 15,600 acres of first priority exception lands and approximately 800 acres of

first priority 'completely surrounded' resource lands under Subsection 3(a). The Council then proceeded to satisfy the remainder of the Subsection 1 estimated urban land need by designating resource lands under either or both the 'specific land need' provision at Subsection 4(a), or the 'maximum efficiency' provision of Subsection 4(c). The final decision on March 6, 1997, designated 18,579 acres[.]" (Footnotes omitted.)

Metro's decision resulted in numerous appeals to LUBA that were consolidated for hearing and decision. Ultimately, 22 separate appearances were made by counsel or *pro se* parties, with some counsel representing numerous parties and some of the parties appearing as both opponents and proponents of different parts of Metro's decision. The questions that were presented ranged from fundamental planning issues, on which the fate of Metro's entire decision did or could have turned, to the correctness of the actions it took with respect to particular parcels.

LUBA's consideration of the appeals culminated in a cogent and thorough opinion that is 152 typewritten pages in length. We will attempt to summarize LUBA's central holdings before we turn to the petitioning parties' specific assertions that LUBA erred in those holdings or in the reasoning underlying them.[2]

LUBA first concluded that Metro had not erred in basing its projections of the amount of land needed under OAR 660-021-0030(1) on the subsequent draft report rather than the adopted UGM functional plan. Further, LUBA held, Metro was not required by OAR 660-021-0030(2) to study *all* lands adjacent to the UGB for suitability as urban reserve areas. Hence, Metro's failure to do so was not contrary to the rule *per se*, nor was its "pre-screening" and resulting exclusion of certain areas from the sample of those it would consider. However, LUBA concluded that Metro had not studied

---

[2] We emphasize that our objective here is not to provide a comprehensive description of all of LUBA's holdings, but to summarize those that are important to an overview of the case or to our discussion later in this opinion. All of the holdings that we summarize were of course made in response to arguments of the parties. Given the large number of parties and the purpose of the summary, we will generally not identify the proponents who made the specific arguments giving rise to LUBA's various holdings.

"enough" adjacent land to satisfy the rule, especially given the increase in the estimated amount of land needed and the decrease in the amount of land included in the study samples that occurred during the study process. LUBA explained:

> "In the present case, the limited inventory Metro compiled contained, at best, approximately 16,000 acres of developable first priority land [under OAR 660-021-0030(3)], and thus, notwithstanding an apparent abundance of other studied and unstudied higher priority lands in the region, Metro's inventory did not contain enough higher priority lands to satisfy the revised urban land need of 18,300 acres without resorting to lower priority lands."

LUBA concluded that Metro had impermissibly "create[d] the very inadequacy" that necessitated its designation of lower priority land under the subsection (3) rankings by failing to include enough available higher priority land "in the subset of lands studied" under subsection (2) to make it possible to designate "all eligible higher priority lands in the area before [resorting] to lower priority lands."

LUBA was not deterred from that conclusion by Metro's argument that it *had* made all of its urban reserve designations *under subsection (3)* from the highest priority (subsection (3)(a)) lands. According to Metro, its remaining urban reserve designations were made pursuant to subsection (4) rather than subsection (3) and consisted of lands that it had not classified according to priority under subsection (3). For example, Metro designated some urban reserves in the Hillsboro area pursuant to the jobs/housing provision in subsection (4)(a), without reference to the subsection (3) priorities of the lands designated on that basis.

However, LUBA concluded that Metro had also acted inconsistently with the rule in that respect. LUBA reasoned that the rule required Metro to complete the prioritization process under subsection (3) for all the lands treated as suitable under subsection (2) before invoking subsection (4) and before making its urban reserve area designations. Hence, LUBA rejected Metro's approach of limiting its suitability studies "so that it could satisfy its urban land need by designating only Subsection (3)(a) first priority lands *and*

lower priority lands under Subsection 4." (Emphasis LUBA's.) LUBA explained:

"We understand Metro to contend that subsection 4 allows Metro to designate any land it chooses without regard to the Subsection 3 priorities, as long as it finds that one of the 'reasons' provided in Subsection 4(a) to (c) is satisfied.

"Metro's interpretation of Subsection 4 is not supported by the text of that provision and is contrary to and tends to undermine the Subsection 3 priority scheme. First, the predicate to including '[l]and of lower priority under [Sub]section 3' for any of the three Subsection 4 exceptions is a finding that 'land of higher priority is found to be inadequate to accommodate' the urban land need for any of the three reasons provided in Subsection 4(a) to (c). Subsection 4 does not limit the scope of this required finding to first priority lands or whatever arbitrary cutoff a local government reaches before it decides to resort to Subsection 4. Instead, Subsection 4 refers to '[l]and of lower priority under [Sub]section 3' and 'land of higher priority,' which is a plain invocation of the Subsection 3 priority scheme in its entirety. Second, under Metro's interpretation, a local government that fails to consider the adequacy of lands intermediate in priority between first priority lands and the lower priority land under consideration is essentially creating the inadequacy that justifies application of Subsection 4. Doing so undermines and hence is inconsistent with the urban reserve rule priority scheme.

"Accordingly, we conclude that correct application of Subsection 4 requires the local government to categorize the inventory of suitable lands according to their Subsection 3 priorities and subpriorities, and then, in considering a specific site under one of the Subsection 4 exceptions, determine that no higher priority land is adequate to meet the particular subsection 4 need. As noted elsewhere, in the present case Metro designated fourth priority lands under Subsection 4(a) and (c) without determining whether higher priority lands, including first priority or lower capability fourth priority lands, are adequate to meet the Subsection 4 need."

In addition to concluding that Metro's designation process was inconsistent with the substantive requirements of subsections (2), (3) and (4), LUBA also determined that

Metro's findings were not sufficiently explanatory to satisfy subsection (5). Among the connections in which LUBA held that Metro's findings were deficient was its failure to sufficiently explain its suitability determinations by reference to the criteria in subsection (2), as distinct from the raw "URSA-matic" data.

Beyond its holdings concerning Metro's violations of the *essential* requirements of subsections (2), (3) and (4), LUBA also concluded that Metro's process failed to satisfy various more mundane operational requirements of the rule. LUBA rejected the contentions that Metro had acted inconsistently with subsection (2) by including both resource and nonresource or exception lands in the same URSAs, and by not applying the exceptions criteria of OAR 660-004-0010(1)(c)(B)(i)-(iv) independently of the Goal 14 locational factors in connection with subsection (2). However, LUBA held that Metro was required to but had failed to conduct an alternative sites analysis pursuant to OAR 660-004-0010 before including any lower priority land in urban reserves under subsection (4). LUBA further held that Metro was required to "determine with respect to the lands studied that each of the [Goal 14 locational] factors is satisfied, *i.e.,* achieve[s] a defined threshold, in order to find that land is 'suitable' for inclusion in urban reserves." LUBA determined that Metro had failed to do so, and, additionally, that it had committed substantive errors in its application of factors 3, 4, 6 and 7.

■■ LUBA sustained or rejected numerous other specific challenges to Metro's decision that, to the extent discussion is required, we will describe in dealing with the specific issues. Finally, LUBA rejected the argument of Metro and certain other parties that, because the ordinance through which Metro made the challenged decision contained a severability clause, LUBA should "sever all parts or designations of the [Metro] decision that were not analyzed or were sustained on appeal." LUBA said:

> "We question whether we have authority to make determinations with respect to aspects of a decision that were not challenged or raised on appeal. Even if we do, we would decline to exercise it here, because some of the bases for

remands we have sustained are so general or pervasive that we would find it difficult to determine the precise boundaries of the parts or designations of the decision [that] have not been affected by our remand."

LUBA added in a footnote:

"However, we know of nothing prohibiting Metro from determining, on remand, what aspects or designations of the decision were not affected by the remand and thus which may be severed from the proceedings on remand by virtue of the severance clause."[3]

With the exception of one or two dropouts and some changes of counsel, by and large the same parties and persons who appeared before LUBA now appear before us. As we have observed, LUBA's opinion is cogent and comprehensive, and we agree with it in most of its particulars. An opinion of comparable length and detail by us would serve no purpose. Consequently, we will not attempt to duplicate LUBA's opinion, beyond the summary that we have provided, and we will address only those issues in connection with which we consider some modification of LUBA's opinion to be indicated, or those matters on which we have something to add that may be of significance in other contexts. As we customarily do, we will also address the broad issues that are likely to arise on the remand to Metro. However, given the combined effect of LUBA's and our opinions, it would appear that there is very little, if anything, that Metro decided initially that is not subject to or open for reconsideration on remand. The problems with Metro's present decision begin very close to the starting point of the process under the urban reserve rule. Given the substantial possibility that Metro's reconsideration will result in further determinations by it that affect the pertinent matters, we will not discuss the issues that the parties now raise that affect *only* property-specific aspects of Metro's and LUBA's present decisions.[4]

---

[3] We note, however, that LUBA's remand to Metro, and ours, is plenary. Any conclusion by Metro that an "aspect or designation" in its original decision was not disturbed in the present review process would, of course, be subject to LUBA's and our consideration in any appeal that may be brought from Metro's decision on remand.

[4] Two matters that pertain to the nature of our review call for early, if brief, comment. LUBA observed in a footnote to its opinion:

"Most of the issues in these consolidated appeals revolve around the meaning and correct application of the urban reserve rule. The interpretation of

The first matter that calls for discussion is presented by Metro's argument (which various other parties also present in different forms) that LUBA erred by not giving effect to the severability clause of the adopting ordinance and thereby affirming those urban reserve designations that LUBA did not specifically and independently find to be contrary to the rule. The problem with Metro's argument is that it rests on a misperception of what LUBA was reviewing and of the nature of the review exercise that LUBA was performing.

 "Severability" is a concept that pertains to the application and interpretation of statutes and that relates to whether and when the nonoffending provisions of a statute can be given effect notwithstanding the invalidity of a particular provision. *See, e.g., Pavlicek v. S. I. A. C.*, 235 Or 490, 385 P2d 159 (1963). The same principle applies to local ordinances, as legislative enactments. *See Lane County v. Heintz Const. Co. et al*, 228 Or 152, 364 P2d 627 (1961). We question

administrative rules, like that of statutes, is a matter of the enactor's intent (in this case the intent of LCDC), and subject to the analytical framework articulated in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). Under that familiar framework, the first step of analysis is to examine the text of the rule in its context. If the enactor's intent is clear from the textual and contextual inquiry, then no further inquiry is necessary. If and only if the enactor's intent is not clear from that textual and contextual inquiry, it is appropriate to consider legislative history. If that does not resolve the intended meaning of the text, resort to general maxims of statutory construction is permissible. *Id.* at 611-12. In the present case, although the parties disagree about the meaning, or more precisely the correct application, of a number of provisions in the urban reserve rule, no party suggests that it is *necessary* to resort to the second and third stages of the *PGE* analysis. We agree that each of the interpretational issues raised in this appeal are resolvable by examination of the text and context of the urban reserve rule, and resolve them accordingly in the body of this opinion. However, in the interests of brevity, we do not repeatedly invoke the *PGE* formula at the many places in this opinion where we discuss and resolve interpretational issues." (Emphasis in original.)

We agree with LUBA that the issues presented here are subject to resolution at the textual and contextual level of analysis. We also agree that the appropriate focus of their opinion and ours should be on the substance of what we are reviewing rather than on repeated incantations of the method of review.

The second matter that calls for early attention is the argument of one of the petitioners that, although Metro's overall decision is legislative in nature, the part of the decision that removed a particular property from one of the URSAs qualifies as and should be reviewed as a separate quasi-judicial decision. We do not agree that the subparts of a jurisdiction-wide legislative decision can or should be individually treated as quasi-judicial decisions. *See Lima v. Jackson County*, 56 Or App 619, 643 P2d 355 (1982); *Miller v. City of Portland*, 55 Or App 633, 639 P2d 680, *rev den* 292 Or 825 (1982).

whether severability is the proper characterization of the concept that the parties here are asserting. LUBA was not reviewing the ordinance *as a legislative enactment,* but was reviewing a *land use decision*—with many component parts—that Metro chose or was required by its own procedures to promulgate through the form of an ordinance. Notwithstanding that form, LUBA's adjudicative function in connection with the review of Metro's urban reserve designations was precisely the same as if the document embodying the designations had been captioned a "decision" instead of an "ordinance."

It follows that the dispositional question that confronted LUBA was not one of "severability," but one involving the appropriate scope of its remand of the land use decision that it was reviewing. In any event, whether the problem is properly characterized as one of severability or the proper scope of remand, LUBA's holding on this point was correct. In resolving that question, LUBA took into account that, under its disposition of the substantive issues, Metro had misapplied the urban reserve rule in numerous and substantial ways and, on remand, would be required to correct its designation process going all the way back to its early stages. LUBA concluded that those circumstances warranted a plenary remand to enable Metro to reconsider its decision under what LUBA had held to be a correct understanding of the particulars of the rule. If LUBA was correct in its underlying substantive holdings, then it did not err by remanding Metro's decision in its entirety. The remaining issues that we will address concern the parties' challenges to those underlying holdings.[5]

■ In essence, LUBA interpreted OAR 660-021-0030(1)-(4) as a series of progressive (if not hierarchical) requirements with interrelated objectives. Under LUBA's view, the correct application of any of the subsections depended on the proper and complete application of the one before it. Hence,

---

[5] We observe at this point, however, that the result of our review necessitates reconsideration by Metro that goes to an even earlier stage in the process than LUBA's decision would have required. Consequently, we affirm LUBA's holding that a plenary, "nonseverable" remand is the appropriate disposition.

the suitability studies under subsection (2) had to be suffi-
cient in their selection and number to make possible the des-
ignation of urban reserve areas from the highest possible pri-
orities under subsection (3); and the designation of areas of
lower priority pursuant to subsection (4) could not take place
until all lands classified as suitable under subsection (2) had
been assigned their priorities or subpriorities in the lettered
sequences of subsection (3). Many of the assignments of error
that the parties, including Metro, make here are directed
against that essential view of the rule or LUBA's application
of that view. The single aspect of LUBA's interpretation that
the parties contest or support most avidly is its conclusion
that the lower priority designation provisions of subsection
(4) may not be invoked by a planning jurisdiction until all of
the lands in question have been classified according to their
subsection (3) priorities.

The most persuasive argument that has been pre-
sented to us for reversing both LUBA's overview of the rule
and some of its specifics appears in the City of Hillsboro's
brief as a petitioner. It states:

> "Subsection 2 of the Urban Reserve Rule [OAR 660-021-
> 0030] requires Metro to study and identify land 'suitable'
> for designation as an urban reserve. Subsection 3 of the
> Urban Reserve Rule establishes a system of priorities by
> which 'land found suitable for an urban reserve may be
> included within an urban reserve area.' Subsection 4 of the
> Urban Reserve Rule establishes a mechanism whereby
> Metro may designate land of lower priority as an urban
> reserve if it finds land of higher priority to be inadequate to
> provide the amount of land determined to be needed under
> Subsection 1 of the Rule, for one of three listed reasons.
> Thus, it can be seen that performing the inventory of suit-
> able land required by Subsection 2 is a necessary precursor
> to applying both Subsections 3 and 4.

> "In [its] Order, LUBA concludes that Subsection 2 of the
> Urban Reserve Rule requires Metro to study for suitability
> 'enough higher priority lands to avoid creating the inade-
> quacies that justified its designation of some lower priority
> lands' under Subsection 4 of the rule. In other words,
> according to LUBA, the suitability study required by Sub-
> section 2 will never be adequate if it does not produce
> enough higher priority 'suitable' land to avoid providing

justification for designation of lower priority lands under Subsection 4. This interpretation is inconsistent with the intent of the Urban Reserve Rule because it would make it impossible to use the process established by Subsection 4 of the Rule.

"The Court should reverse LUBA's interpretation that avoiding justification for designation of lower priority land under Subsection 4 of the Urban Reserve Rule is determinative of whether enough land has been studied for suitability under Subsection 2 * * *[.]

"* * * * *

"[I]t appears LUBA * * * [concluded] that the Urban Reserve Rule requires Metro to first identify a total of (in this case) approximately 18,300 suitable acres, classified according to the priority categories of Subsection 3, that would be designated as urban reserves *without* consideration of Subsection 4. Only after doing this can Metro identify lands of lower priority to be designated as urban reserves pursuant to Subsection 4, while also identifying offsetting reductions in higher priority lands designated as urban reserves.

"The problem with LUBA's interpretation is that the above described methodology is not *required* by the Urban Reserve Rule. Nothing in the Urban Reserve Rule requires Metro to perform a complete priority analysis of all suitable lands prior to considering Subsection 4. Subsection 3 does not explicitly require that the priority of all land found to be suitable under Subsection 2 be determined, but rather states only that *designation* of areas as urban reserves must be *based* on Subsection 3 priorities. Subsection 4(a) (specific land needs) and (c) (maximum efficiency of land uses) are by their nature *exceptions* to the priority system, because they provide bases for identifying specific sites that warrant designation as urban reserves *regardless of* their priority under Subsection 3. What Subsections 4(a) and (c) require is a demonstration that higher priority land is inadequate to provide the amount of land needed. More specifically, Subsection 4(a) requires a showing that a specific type of identified land need 'cannot be reasonably accommodated on higher priority lands.'

"For instance, if Metro concludes that the amount of land determined to be needed under Subsection 1 of the Urban Reserve Rule can be provided through designation of

solely land that is first priority under Subsection 3(a) and land needed to meet a favorable jobs/housing ratio for subregional areas under Subsection 4(a), which is the case here, Metro should only be required to show that the need to meet a favorable jobs/housing ratio for the relevant subregion cannot be reasonably accommodated on higher priority lands. This would require identification of the lands with higher priority under Subsection 3 for that subregion, but not necessarily require categorization of the inventory of suitable lands for the entire Metro region according to the Subsection 3 priorities, as LUBA's Order would require. In addition, satisfying the 'cannot be reasonably accommodated on higher priority lands' test of Subsection 4(a) does not require that Metro identify *which* higher priority land will *not* be designated as urban reserves because Subsection 4(a) was applied, as would also be required under LUBA's interpretation, and such identification would serve no useful purpose." (Emphasis in original; footnote omitted.)

While the city makes a strong practical and legal case for the opposite view, after examining the text and context of the rule, we must agree with LUBA's understanding of the rule in the challenged respects. OAR 660-021-0030 contains recurring language that indicates that its numbered provisions are to be applied sequentially, that the priorities of subsection (3) are to be determined and are to be the governing consideration in designating urban reserves, and that the "exceptions" in subsection (4) can only be applied—if at all—to lands that have been prioritized in accordance with subsection (3).

To illustrate, subsection (2) *concludes* with the sentence, "[l]ocal governments shall then designate for inclusion within urban reserve areas those suitable lands which *satisfy the priorities in [sub]section (3) of this rule*." (Emphasis added.) Subsection (3) begins with the general provision that suitable lands "may be included within an urban reserve area *only* according to the following priorities[.]" (Emphasis added.) Finally, subsection (4) begins:

"Land of lower priority *under [sub]section (3)* of this rule may be included if land of higher priority is found to be inadequate to accommodate the amount of land estimated in [sub]section (1)[.]" (Emphasis added.)

We also find that LUBA's interpretation gives effect to all of the provisions of OAR 660-021-0030 and fits the requirements of the rule together as a coherent whole. We disagree with the city's assertion that, under LUBA's interpretation, subsection (4) would be a nullity. LUBA's interpretation does not prevent the application of subsection (4) for the purpose of designating lower priority lands under the circumstances envisioned in that subsection. Rather, LUBA's interpretation requires that sufficient suitable higher priority lands be considered and classified pursuant to subsections (2) and (3) so that resort to subsection (4) will not be necessary to *identify* any of the land that is *available* for designation as urban reserves. LUBA's interpretation does not prevent the use of subsection (4) to *designate* lower priority lands as urban reserves under the limited circumstances contemplated by paragraphs (4)(a) through (c). As the city correctly notes, subsection (4) contains *exceptions* to the priority requirements for urban reserve designation contained elsewhere in the rule. LUBA's interpretation simply ensures that the exceptions will operate only under the circumstances that justify them and will not serve instead as a default mechanism for filling voids in the pool of available lands left by an incomplete application of the identification and prioritization process under subsections (2) and (3).

We conclude that LUBA's interpretation is correct in the relevant respects, and that the text and relevant context of OAR 660-021-0030 are inconsistent with the contrary understanding of the rule espoused in the foregoing arguments by the city and in the similar arguments advanced by other parties.

■ Petitioners Coalition for a Livable Future et al (Coalition) and the three petitioning state agencies (state),[6] among other parties, argue that Metro's designations and designation process were even more fundamentally flawed and contrary to the rule than LUBA found them to be. They contend first that Metro and, in turn, LUBA acted inconsistently with OAR 660-021-0030(1) by basing the estimate of

---

[6] The three agencies are the Departments of Agriculture, Transportation and Land Conservation and Development. Although the Coalition and the state appear separately, they join in and adopt the salient portions of one another's briefs.

needed land on the subsequent draft report instead of Metro's adopted UGM functional plan and underlying acknowledged documents. *See* ORS 268.390. The Coalition and the state maintain, *inter alia*, that Metro violated Goal 2 by so doing, because the goal requires land use actions to be consistent with comprehensive and regional plans, and requires the plans to "be the basis for specific implementation measures."

LUBA rejected those arguments on the ground that there was no inconsistency between the draft report and Metro's estimate, on the one hand, and the functional plan on the other. It is not apparent to us that the functional plan and the draft report can be viewed as consistent with one another, when the net result of using one as the basis for calculation is an estimated need of over 4,000 more acres—or approximately one-third again as much—as would result from using the other.

In any event, we do not understand the proper inquiry under Goal 2 to be whether the draft report is consistent with the functional plan. Rather, the question is whether the land use action itself, *i.e.*, the determination of the amount of needed land, is consistent with and based upon the applicable plan and "related implementation measures." The objective of the goal is to make the planning process and planning documents the "*basis* for all decisions and actions related to use of land." (Emphasis added.) The draft report is not a plan or a planning document of the kind that Goal 2 contemplates. It is an informal study that, by its own terms, is not related to the designation of urban reserves and, by its own terms, is not even a "final" document for the purposes at which it is directed. Under Goal 2, the computation of need must be based upon the functional plan and/or Metro's other applicable planning documents. Metro may, of course, amend those documents in the manner prescribed by law, if it chooses, but it cannot simply subordinate them to an informal study that is concerned with a remotely related matter.

■ It is true that the urban reserve rule would take precedence over other provisions that are inconsistent with it for purposes of the issues in this case. However, there is no inconsistency between Goal 2 and OAR 660-021-0030 in this connection. Subsection (1) of the rule does not purport to

describe the sources on which the estimate of the amount of needed land may be based. Hence, the rule does not supplant the relevant Goal 2 requirements relating to the documents that may serve as the basis for land use actions and that, for the reasons discussed, do not allow the draft report to be the basis for the estimate of need.[7]

In their third assignments, the Coalition and the state identify another problem in LUBA's analysis. As we have noted before, subsection (2) contains the requirement that the study of lands "for suitability for inclusion within urban reserve areas" is to be measured by factors "3 through 7 of Goal 14 *and* by the requirements of OAR 660-004-0010."[8] (Emphasis added.) However, LUBA concluded that, because of redundancy or overlap in their application and requirements, "compliance with Goal 14, factors 3 to 7, also demonstrates compliance with exceptions criteria [OAR 660-004-0010(1)(c)(B)](i), (iii) and (iv)," for purposes of subsection (2) of the urban reserve rule. (Footnote omitted.) LUBA went on to note that the applicability of the "alternative sites" analysis required in connection with exceptions criterion (ii) "is more problematic," but it concluded:

> "Like Metro, we have difficulty perceiving how local governments are required to apply, or demonstrate compliance with, exceptions criterion (ii) as part of the Subsection 2 suitability analysis. The apparent effect of exceptions criterion (ii) within the context of the urban reserve rule is that resource lands are not 'suitable' as long as nonresource lands can reasonably accommodate the particular need at issue. However, the ability of nonresource lands to accommodate either the urban land need or other identified needs cannot be known with any certainty until after application of first Subsection 3 and then Subsection 4. * * *

---

[7] By contrast, we reject Metro's argument that LUBA erred insofar as it failed to sustain certain uses of the acknowledged RUGGOs that Metro made in its decision. As LUBA correctly noted, citing *Oregonians in Action v. LCDC*, 121 Or App 497, 854 P2d 1010, *rev den* 318 Or 170 (1993), the urban reserve rule is the controlling provision here, and the fact that the RUGGOs are acknowledged does not mean that they can authoritatively *apply to this decision* in a manner that is inconsistent with the rule. *See also Dept. of Transportation v. Douglas County*, 157 Or App 18, 967 P2d 901 (1998).

[8] Factors 3 through 7 and subsection (1)(c)(B), the relevant portion of the cited rule, are quoted in footnote 1.

> "We agree with Metro to the extent it argues that exceptions criterion (ii) can be meaningfully applied only within the context of designating resource land under Subsection 4."[9]

■ The Coalition and the state are correct in arguing that LUBA was mistaken in concluding that exceptions criteria (ii), (iii) and (iv) need not be considered, independently of the locational factors of Goal 14, in applying subsection (2) of OAR 660-021-0030. LUBA's conclusion is squarely contrary to the language of the subsection. Moreover, insofar as the conclusion was premised on the understanding that the exceptions criteria are essentially duplicative of the Goal 14 factors, it is also contrary to the language of OAR 660-004-0010(1)(c)(B), which states that only the first of the four criteria is satisfied *ipso facto* "by compliance with the seven factors of Goal 14." LUBA's suggestion that there is a logical circularity in applying exceptions criterion (ii) as part of the suitability analysis of OAR 660-021-0030(2) may or may not be correct. In either event, LUBA's task and ours is to interpret and apply the rule as LCDC wrote it.

■ Somewhat relatedly, we also agree with the basic thrust of the state agencies' and the Coalition's argument under their fourth assignments of error. LUBA properly rejected Metro's approach of relying on the URSA-matic data as the determinant of which lands were suitable for designation (at least in the absence of a showing that the data was responsive to the considerations required by subsection (2) of the rule). LUBA also held—correctly—that local governments "must apply each Goal 14 [locational] factor equally and include lands in urban reserves only where all of the factors justify that inclusion." LUBA nevertheless concluded that Metro could establish "defined thresholds" for each of the factors and could find lands unsuitable for designation if they "fail to achieve at least one of the defined thresholds." The state and the Coalition contend that LUBA erred in the last conclusion.

---

[9] For reasons that are not directly germane to our discussion, LUBA nevertheless concluded that Metro has not demonstrated compliance with criterion (ii) in connection with its application of subsection (4).

In *Halvorson v. Lincoln County*, 82 Or App 302, 304-05, 728 P2d 77 (1986), we said that the decision to include land in an amended urban growth boundary required a balancing of all of the factors rather than "mechanical" reliance on any "one isolated factor." *See also City of Salem v. Families For Responsible Govt.*, 64 Or App 238, 668 P2d 395 (1983), *rev'd on other grounds* 298 Or 574, 694 P2d 965 (1985). Although the immediate question in this context is the suitability determination rather than the actual inclusion of land in a UGB, the same reasoning is applicable. Moreover, OAR 660-021-0030(2) does not indicate that the factors are to be weighed or that any one of them may be given decisive weight without consideration of the others. We agree with the state and the Coalition that LUBA erred insofar as it concluded otherwise.

 The next matter that calls for discussion is presented by the arguments in the City of Hillsboro's petitioner's brief and the cross-petitioners' brief of the cities of Lake Oswego and West Linn. OAR 660-021-0020, a section of the urban reserve rule, provides, in relevant part:

> "Cities and counties cooperatively, and *the Metropolitan Service District for the Portland Metropolitan area* urban growth boundary, are authorized to designate urban reserve areas under the requirements of this rule, *in coordination with* special districts listed in OAR 660-021-0050(2) and other *affected local governments, including neighboring cities* within two miles of the urban growth boundary." (Emphasis added.)

The three cities contend that the rule, and the corresponding provisions of ORS 268.385 and Goal 2, require more specific attention to and accommodation of the cities' respective planning and related concerns by Metro than the mere "consideration and response" that LUBA held to be necessary.

Given the fact that LUBA's and our disposition amounts to a comprehensive remand of the Metro decision, the arguments on this issue are left in a somewhat abstract posture. In general, however, we agree with the cities that the coordination requirement of the urban reserve rule parallels that of Goal 2 and of the statute and was correctly addressed in the following passage from LUBA's opinion in

*DLCD v. Douglas County*, 33 Or LUBA 216 (1997), where the requirement was applied in conjunction with the state agency's input concerning a proposed county comprehensive plan amendment:

> "Goal 2 requires, in part, that comprehensive plans be 'coordinated' with the plans of affected governmental units. Comprehensive plans are ' "coordinated" when the needs of all levels of government have been considered and accommodated as much as possible.' ORS 197.015(5); *Brown v. Coos County*, 31 Or LUBA 142, 145 (1996). Comprehensive plan coordination is a two step process, which requires:

> " '1. The makers of the [comprehensive] plan engaged in an exchange of information between the planning jurisdiction and affected governmental units, or at least invited such an exchange.'

> " '2. The jurisdiction used the information to balance the needs of all governmental units * * * in the plan formulation or revision.' *Brown*, 31 Or LUBA at 146, citing *Rajneesh v. Wasco County*, 13 Or LUBA 202, 210 (1985).

> " '3. A local government is not required to 'accede to every request that may be made by a state agency.' *Brown* at 146. It must, however, 'adopt findings responding to legitimate concerns.' *Id.*, citing *Waugh v. Coos County*, 26 Or LUBA 300, 314 (1993).

> "The county acknowledges it did not adopt 'technical findings' to respond to the agency requests, but argues that Goal 2 does not require such findings so long as there is an adequate factual base in the record to support its decision. The county relies on *Redland / Viola / Fischer's Mill CPO v. Clackamas County*, 27 Or LUBA 560 (1994), in which we explained that the requirement that legislative findings be supported by an 'adequate factual basis' can be met either through findings in the decision, or through 'argument and citations to facts in the record adequate to demonstrate that the challenged legislative decision complies with applicable legal standards. *Id.* at 564.

> "The requirement that the county's findings must be supported by an adequate factual basis is distinct from the Goal 2 coordination requirement. While an adequate factual basis for the decision can be established through argument and citation to the record, in order to satisfy the Goal 2 coordination requirement, the county is required to adopt

findings that respond to agency concerns. *ONRC v. City of Seaside*, 29 Or LUBA 39, 56 (1995). A statement in the record that the staff rejected the agency concerns does not satisfy the coordination requirement." (Footnote omitted.)

While we agree with the foregoing synopsis of the *legal* requirement, we also note that the essence of coordination must be a cooperative effort on the part of the governmental bodies involved. LUBA and the courts can require findings or other procedural devices to demonstrate that the necessary efforts have been undertaken. But in the last analysis, the participating bodies alone are responsible for undertaking the efforts. It is difficult to imagine a process that depends more for its success than this one on the participants' active desire and efforts to make it successful. The findings and other procedural trappings that LUBA and the courts may require can be nothing more than shadows if the parties are not committed to achieving any underlying substance for them to reflect.

Similarly, the invitations that the City of Hillsboro and others extend to us to take into account the "practical realities" in "construing the correctness" of Metro's and LUBA's decisions may also lose sight of the limitations on what the courts can and should do. It is not our function to make either policy or planning decisions. Our role here is to assure that the decisions of Metro and LUBA, insofar as they are challenged, comply with the applicable law that has been promulgated by others. And, we emphasize again, it is unlikely that a land use decision of this magnitude and complexity can ever be found to comply with the applicable requirements unless the decision maker and the participating parties are committed to achieving that objective.

Only one other issue requires brief specific mention, because of its likely significance on remand. We have considered and reject without discussion Metro's contention that LUBA erred in its holding as to the nature and specificity of the findings that are required under OAR 660-021-0030(5).

Affirmed as modified.