Argued and submitted September 26, reversed and remanded to LUBA with instructions to remand case to city for further proceedings December 14, 2005

**1000 FRIENDS OF OREGON**
and Friends of Yamhill County,
*Petitioners below,*

*and*

**COLUMBIA EMPIRE FARMS, INC.,**
*Petitioner,*

*v.*

**CITY OF DUNDEE**
and Department of Transportation,
*Respondents.*

2004-144, 2004-145; A129505

124 P3d 1249

Jeffrey G. Condit argued the cause for petitioner. With him on the brief was Kelly S. Hossaini.

Keith Kutler, Assistant Attorney General, argued the cause for respondents. With him on the joint brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Erin C. Lagesen, Assistant Attorney General, and Pamela J. Beery.

Andrew H. Stamp filed the brief *amicus curiae* for Oregon Home Builders Association.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Deits, Judge pro tempore.

HASELTON, P. J.

**HASELTON, P. J.**

Petitioner Columbia Empire Farms, Inc., seeks judicial review of an order of the Land Use Board of Appeals that affirmed the City of Dundee's amendment of the city's comprehensive plan to implement the construction of a bypass, the Newberg-Dundee Transportation Improvement Project, along Highway 99 West. On judicial review, petitioner makes several arguments concerning the city's decision to amend its comprehensive plan. First, petitioner argues that the city's amendment to its comprehensive plan is flawed because its determination that the implementation of the bypass project complies with Statewide Land Use Planning Goal 10 is based on a buildable lands inventory prepared in 2003 ("the 2003 BLI") that was not included in the city's comprehensive plan. Second, petitioner argues that the city erred in failing to address "needed housing" as required by ORS 197.303(1). Because we agree with petitioner on its first assignment of error, we need not reach petitioner's remaining arguments. For the reasons set forth below, we reverse and remand to LUBA with instructions to remand to the city for further proceedings.

The relevant facts are not in dispute:

"[The Oregon Department of Transportation] is proposing a Highway 99 bypass (from southwest to northeast) between the cities of Dayton, Dundee, and Newberg to relieve severe traffic congestion in the area. The cities of Dayton and Newberg, and Yamhill County, also adopted ordinances related to approving the bypass. The purpose of the bypass is to alleviate congestion on Highway 99, particularly where the highway narrows from four lanes to two in the City of Dundee. The bypass will go through undeveloped vacant land in the city's urban growth boundary (UGB) south of the existing highway. The bypass also calls for the East Dundee Interchange, which is a connection to existing Highway 99 that is primarily outside the city's UGB, but extends partially into the Dundee UGB."

*1000 Friends of Oregon v. City of Dundee*, 49 Or LUBA 601, 604 (2005) (footnote omitted). Petitioner owns a farm located between Dundee and Newberg that will be trisected by the planned bypass. In this case, petitioner challenges the

city's amendment of its comprehensive plan to add provisions to implement the proposed bypass. The plan amendment supported a specific location of the proposed bypass within the city, as well as setting forth the details of the city's participation in the multijurisdictional project. In support of that amendment, the city made numerous findings. Central to petitioner's challenges, and to our analysis, are the following findings:

"When the City of Dundee completed its last periodic review in 1990, the City concluded that adequate land remained in the UGB to accommodate projected population and employment needs. The portion of the Bypass within the Dundee UGB crosses land that is identified in the plan for residential use. However, the land is still in agricultural use and will need to be rezoned prior to development. The LDEIS [Location Draft Environmental Impact Statement] acknowledges that the Bypass will displace some urban lands that are designated to accommodate projected land needs for housing, commercial, industrial or public uses. Findings on page 5 of the July 14, 2004 staff report stated: 'Recent studies indicate there is a surplus of land within the UGB to meet anticipated demand within the 20-year planning horizon.' The loss of land to accommodate the Bypass will not impact the City's ability to address future land requirements.

"* * * * *

"The Bypass location corridor through the Dundee UGB will impact lands in East Dundee that are identified in the Comprehensive Plan for future residential use. However, the larger parcels are currently farmed and included in an 'Agricultural Holding' zone until need is shown and a zone change approved. Prior to recommending that the City Council approve the proposed policies on July 21, 2004, the Planning Commission concluded that *the adequacy of available lands for housing was established in the recent buildable lands inventory and analysis.* (See memorandums from City Planner Walt Wendolowski dated July 26, 2004 and April 9, 2003 that were submitted into the record.)

"*Within the past few years, the City of Dundee has updated population projections, buildable land inventories, and land need projections for various categories of land use. While these studies have not yet been incorporated into the*

*Dundee Comprehensive Plan, the City Council has coordi-*
*nated with Yamhill County and adopted a population pro-*
*jection of 5,744 for the year 2020 and concluded that*
*adequate land is available within the existing UGB to*
*accommodate projected 20-year land needs.* Based on GIS
[geographic information systems] information submitted to
the record, ODOT estimates that the location corridor
impacts 27.54 acres of designated residential land within
the City's UGB, while the roadway will directly displace
about 16.52 acres. Subtracting this amount from the 'base
case' scenario (no change in development patterns or den-
sities)—the City will still retain a surplus of 80 acres of res-
idential land to meet projected housing needs to the year
2020."

(Emphasis added.) The emphasized language refers to the
2003 BLI.

Petitioner's primary argument in support of its first
assignment of error is that the city, in determining that Goal
10 was satisfied, could not properly rely on the 2003 BLI that
had not been incorporated into the city's comprehensive
plan—and LUBA erred in concluding otherwise. In particu-
lar, petitioner contends that the city's reliance on the 2003
BLI violated both Goals 2 and 10.[1] Further, as support for
that argument, petitioner invokes, as it did before LUBA,
*D. S. Parklane Development, Inc. v. Metro*, 165 Or App 1, 994
P2d 1205 (2000). In *D. S. Parklane Development, Inc.*, we
held that Metro, in designating urban reserve areas for the
Portland metropolitan area, could not rely on a draft report
that was not adopted as part of the comprehensive plan
because, "[u]nder Goal 2, the computation of need must be

---

[1] Goal 2's purpose is "[t]o establish a land use planning process and policy
framework as a basis for all decisions and actions related to use of land and to
assure an adequate factual base for such decisions and actions." That goal further
provides that "[c]ity, county, state and federal agency and special district plans and
actions related to land use shall be consistent with the comprehensive plans of cit-
ies and counties and regional plans adopted under ORS Chapter 269." *See* OAR
660-015-0000(2).

Goal 10's purpose is "[t]o provide for the housing needs of citizens of the state."
It requires that buildable lands for residential use be inventoried and that compre-
hensive plans provide for adequate numbers of needed housing units. It further
indicates that comprehensive plans "should provide for a continuing review of
housing need projections and should establish a process for accommodating needed
revisions." *See* OAR 660-015-0000(10).

based upon the functional plan and/or Metro's other applicable planning documents." *Id.* at 22.

In this case, LUBA held that *D. S. Parklane Development, Inc.,* was distinguishable. LUBA described our decision as holding that Metro "could not choose to rely on an unacknowledged draft study over an inventory completed a year earlier that was part of the acknowledged comprehensive plan, where the results of those two studies were clearly contradictory." 49 Or LUBA at 610. LUBA continued:

> "In this case, the 1988 inventory [which was incorporated into the comprehensive plan] was 15 years old when the challenged decision was made. Approximately two years before the issuance of the challenged decision, the city completed an updated housing inventory prepared specifically to ascertain the projected housing need and the available residential lands. We do not see that the fact that the more recent inventory has not yet been adopted as part of the comprehensive plan makes the city's decision, which relied upon it, somehow inconsistent with the comprehensive plan. In fact, it seems arguable that, if a city has a housing inventory that updates a 15-year old acknowledged inventory, the city must rely on such updated information in order to base its decision on 'an adequate factual base.' *See* Goal 2. As the city asserts, the BLI complies with a policy in the comprehensive plan that provides for periodic re-examination of its residential land supply to determine if there is a need to adjust the UGB. The 2003 BLI implements that policy and is therefore consistent with the plan. Accordingly, the city's findings demonstrating that it has a sufficient supply of residential land to meet future needs are consistent with the comprehensive plan and implementing measures."

*Id.* at 610-11 (citation and footnotes omitted).

Petitioner and *amicus curiae* Oregon Home Builders Association argue that LUBA misconstrued *D. S. Parklane Development, Inc.,* and, consequently, erred in concluding that the city could rely on the 2003 BLI in determining whether the proposed bypass could be implemented at the specified location consistently with Goal 10. As explained below, we agree with petitioner and *amicus.*

The city's initial comprehensive plan, adopted in 1977, designated 430 acres of land for future residential development: Of those 430 acres, 170 acres were farmland in the eastern part of the city. The farmland in the eastern part of the city was placed in a holding zone, to be rezoned for residential use on an as-needed basis. The plan further provided that the UGB would be reexamined every five years. The plan provided no further direction as to how that would occur. The city updated its inventory of buildable land in 1988 and determined that there remained 110 acres of buildable land available for residential development, not including the farmland in the eastern part of the city in the holding zone, and that approximately 30 acres would remain available in 2005. In its periodic review of the plan in 1990, LCDC agreed that "the supply of land is adequate to meet future demand in each residential land category" through 2005.

In 2003, the city prepared the BLI at issue here. That BLI indicated that the city would retain a surplus of somewhere between 97 and 155 acres of buildable residential land through the year 2020. As noted above, the city relied on that estimate in concluding, for purposes of the present plan amendment, that the bypass, although having impact on the amount of residential land available within the UGB, could be implemented within the city consistently with Goal 10. Thus, the city's determination that the plan amendment to implement the bypass complied with Goal 10 was based on data from the 2003 BLI, which, as noted above, contained data at variance with data from the 1988 BLI.

The question, thus, is whether the city can rely on data from a BLI not incorporated into its comprehensive plan in making a determination that proposed plan amendment comports with Goal 10. We turn first to whether LUBA correctly distinguished the present situation from the situation described in *D. S. Parklane Development, Inc.* As noted, *D. S. Parklane Development, Inc.,* concerned Metro's designation of urban reserve areas around the Portland metropolitan UGB. Metro adopted a plan in 1996 that contained estimates about how many households the UGB would need to accommodate at particular points in the future. 165 Or App at 8. Thereafter, Metro planning staff prepared a draft Urban Growth Report based on updated data that indicated that the

UGB would not, in fact, be able to accommodate the growth expected in the time frame. *Id.* at 9-10. The Metro Council then designated urban reserve areas based on the draft report rather than on the projected growth estimates contained in the 1996 plan. *Id.* at 10. As pertinent here, LUBA remanded for reconsideration various aspects of Metro's designation of urban reserve areas, and the petitioners challenged various aspects of LUBA's decision. The petitioners argued that Metro's reliance on the draft report violated Goal 2. In addressing that argument, we noted first that it was "not apparent" that the 1996 plan and the later draft report "can be viewed as consistent with one another." 165 Or App at 22. We continued:

> "In any event, we do not understand the proper inquiry under Goal 2 to be whether the draft report is consistent with the functional plan. Rather, the question is whether the land use action itself, *i.e.*, the determination of the amount of needed land, is consistent with and based upon the applicable plan and 'related implementation measures.' The objective of the goal is to make the planning process and planning documents the *'basis* for all decisions and actions related to use of land.' (Emphasis added.) The draft report is not a plan or a planning document of the kind that Goal 2 contemplates. It is an informal study that, by its own terms, is not related to the designation of urban reserves and, by its own terms, is not even a 'final' document for the purposes at which it is directed. Under Goal 2, the computation of need must be based upon the functional plan and/ or Metro's other applicable planning documents. Metro may, of course, amend those documents in the manner prescribed by law, if it chooses, but it cannot simply subordinate them to an informal study that is concerned with a remotely related matter."

*Id.*

Our rationale in *D. S. Parklane Development, Inc.* was not, as LUBA characterized it in this case, that Metro could not rely on the draft report because "the results of those two studies were clearly contradictory." *See* 203 Or App at 212, quoting 49 Or LUBA at 610. In fact, we stated that the "proper inquiry" was *not* "whether the draft report is consistent with the functional plan." *D. S. Parklane Development,*

*Inc.*, 165 Or App at 22.[2] Rather, the problem that we identified in *D. S. Parklane Development, Inc.*, with Metro's reliance on the draft report was that the report was "not a plan or planning document of the kind that Goal 2 contemplates." *Id.* Here, respondents do not suggest that the 2003 BLI actually *is* a part of the plan or a planning document. Rather, they argue that the city was entitled to rely on the 2003 BLI's conclusion that the city had a sufficient supply of residential land to meet future needs in determining that it "could continue to rely on the inventory included in its comprehensive plan and that an update to that plan was not necessary." The difficulty with respondents' position is that it mischaracterizes how the city used the 2003 BLI. As noted, the city made an explicit finding that " 'the adequacy of available lands for housing was *established* in the recent buildable lands inventory and analysis.' " *See* 203 Or App at 211. Further, the city's determination that it "will still retain a surplus of 80 acres of residential land to meet projected housing needs to the year 2020" was clearly based on the numbers from the 2003 BLI, and not on the numbers contained in the comprehensive plan—which, as noted above, only established that " 'the supply of land is adequate to meet future demand in each residential land category' " through 2005. *See* 203 Or App at 213. Ultimately, respondents' argument fails to address the significance of two critical and incontrovertible facts: (1) the acknowledged plan actually contained an inventory of buildable residential land, and (2) the city's decision rested not on that inventory but instead on the significantly different 2003 BLI that was not incorporated into the plan.

Respondents also contend that *D. S. Parklane Development, Inc.*, is distinguishable from the present case because in *D. S. Parklane Development, Inc.*, the draft report at issue was "an informal study that, by its own terms, is not related to the designation of urban reserves and, by its own terms, is not even a 'final' document," 165 Or App at 22, but

---

[2] In a later case, *1000 Friends of Oregon v. Metro*, 174 Or App 406, 422, 26 P3d 151 (2001), we actually did conclude that that report and plan were inconsistent. The legal issue in that case, however, was different, because by the time Metro had enacted the ordinance at issue there, the report had been incorporated into the plan. *Id.* at 421.

here, the 2003 BLI was a "final" report that was developed for the "purpose of determining whether there was an adequate supply of residential buildable lands in Dundee, pursuant to Urbanization Policy 1 [of the comprehensive plan]." Urbanization Policy 1 indicates that the undeveloped area in the western portion of Dundee within the UGB is to be "designated for residential use, but zoned agricultural until public need is demonstrated for development. The boundary will be re-examined at least every 5 years."

We agree with respondents that the 2003 BLI can fairly be characterized as "final" rather than as a "draft." We further agree that the 2003 BLI can fairly be described as reexamining whether the UGB, particularly with respect to the undeveloped portion of western Dundee, needed alteration, and thus constitutes a review of the type contemplated by Urbanization Policy 1. However, the fact that the comprehensive plan calls for studies to be done does not mean that the results of those studies become part of the comprehensive plan; nor does it mean that the results of those studies are necessarily consistent with existing data that is a part of the comprehensive plan; nor does it mean that land use decisions can be based on those studies rather than on the comprehensive plan.

In sum, a planning decision based on a study contemplated by a comprehensive plan but not incorporated into the comprehensive plan after the study is carried out is not a planning decision that is made on the basis of the comprehensive plan and acknowledged planning documents, as is required by Goal 2. *D. S. Parklane Development, Inc.*, 165 Or App at 22. That is not a matter of mere abstract concern. Rather, it goes to the heart of the practical application of the land use laws: The comprehensive plan is the fundamental document that governs land use planning. Citizens must be able to rely on the fact that the acknowledged comprehensive plan and information integrated in that plan will serve as the basis for land use decisions, rather than running the risk of being "sandbagged" by government's reliance on new data that is inconsistent with the information on which the comprehensive plan was based. LUBA erred in concluding otherwise.

Reversed and remanded to LUBA with instructions to remand case to city for further proceedings.