Argued and submitted February 7, reversed and remanded in part for
reconsideration; otherwise affirmed September 8, 2005

CITY OF WEST LINN,
*Petitioner,*

*and*

FRIENDS OF FOREST PARK,
Arnold Rochlin, Jim Coon
and Cheryl Coon,
*Petitioners,*

*and*

Andrea L. HUNGERFORD
and Richard G. Cohn-Lee,
*Petitioners,*

*and*

Greg MALINOWSKI,
dba Malinowski Farm,
*Petitioner,*

*v.*

LAND CONSERVATION
AND DEVELOPMENT COMMISSION,
*Respondent,*

*and*

METRO,
West Hills Development,
Ryland Group Inc., Clifford Joss
and Springville Road Joint Venture,
*Intervenors-Respondents.*

03-WKTASK-001524;
A122169 (Control), A122246, A122444
(Cases Consolidated)

119 P3d 285

Peggy Hennessy argued the cause for petitioner City of West Linn. With her on the briefs was Reeves, Kahn & Hennessy.

Christine M. Cook argued the cause and filed the brief for petitioners Friends of Forest Park, Arnold Rochlin, Jim Coon, and Cheryl Coon.

Nancy J. Hungerford argued the cause for petitioners Andrea L. Hungerford and Richard G. Cohn-Lee. With her on the brief was the Hungerford Law Firm.

Charles Swindells argued the cause and filed the brief for petitioner Greg Malinowski, dba Malinowski Farm.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent Land Conservation and Development Commission. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solictor General.

Richard P. Benner argued the cause and filed the brief for intervenor-respondent Metro.

Timothy Ramis argued the cause for intevenor-respondents West Hills Development, Ryland Group, Inc., Clifford Joss, and Springville Road Joint Venture. With him on the brief was Ramis Crew Corrigan & Bachrach.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Armstrong, Judge.

LANDAU, P. J.

---

* Brewer, C. J., *vice* Leeson, J. pro tempore.

## LANDAU, P. J.

This is a periodic review proceeding, in which the Land Conservation and Development Commission (LCDC or commission) reviewed for compliance with the statewide planning goals a Metropolitan Service District (Metro) decision to expand the Portland area regional urban growth boundary (UGB). LCDC approved, in part, Metro's expansions to the UGB. Petitioners—the City of West Linn, Friends of Forest Park, Malinowski Farm, and a number of named individuals—seek judicial review of LCDC's final order approving the UGB expansions. Their assignments of error are many and complex. Suffice it to say at this introductory juncture that they pertain generally to two issues: first, the adequacy of Metro's analysis of the need to expand the existing UGB; and second, the adequacy of findings in support of Metro's decision to include certain specific areas within the UGB. We conclude that LCDC erred in determining that Metro's findings were adequate with respect to two of the specific areas, but in all other respects we affirm.

## I. BACKGROUND

We begin with an overview of the periodic review process and the particular periodic review at issue in this case, reserving for our analysis of the individual assignments of error a more detailed examination of the facts and pertinent authorities.

### A. *Periodic review in a nutshell*

ORS 197.628 provides that it is the policy of the state "to require the periodic review of comprehensive plans and land use regulations in order to respond to changes in local, regional and state conditions to ensure that the plans and regulations remain in compliance with the statewide planning goals[.]" Cities with populations in excess of 25,000 inside its urban growth boundary and metropolitan service districts, among others, must conduct such a periodic review every five to ten years after completion of the previous review. ORS 197.629.

The periodic review process is divided into two phases. The first phase involves "the evaluation of the existing comprehensive plan, land use regulations and citizen involvement program and, if necessary, the development of a work program to make needed changes to the comprehensive plan or land use regulations." ORS 197.633(1). The second phase is "the completion of work tasks outlined in the work program." *Id.*

The periodic review, among other things, entails an evaluation of the current regional plan to determine whether it provides sufficient buildable lands within a UGB to accommodate estimated housing needs for 20 years. ORS 197.296(2). That requires the local government to inventory the supply of buildable lands within the UGB and to determine the housing capacity of those buildable lands. ORS 197.296(3)(a). Following that, the local government must conduct an analysis of housing need by type and density range. ORS 197.296(3)(b). The determination of housing capacity and need must be based on data relating to land within the UGB that have been collected since the last periodic review or within the last five years, whichever is longer, ORS 197.296(5)(a), unless the local government finds that a shorter period of no less than three years will provide more accurate and reliable data, ORS 197.296(5)(b).

If the local government determines that housing needs exceed housing capacity, it has three choices: First, it may amend its UGB to include sufficient buildable lands to accommodate housing needs for the next 20 years. ORS 197.296(6)(a). Second, it may amend its comprehensive or regional plan to include new measures that "demonstrably increase the likelihood residential development will occur at densities sufficient to accommodate housing needs for the next 20 years without expansion" of the UGB. ORS 197.296(6)(b). Third, the local government may adopt a combination of those two responses. ORS 197.296(6)(c).

If the local government determines that it is necessary to expand the UGB, it must determine precisely which areas to include within the amended UGB. In making that determination, it is required to give relative priorities to various types of land. First priority is given to land that has been

designated "urban reserve land." ORS 197.298(1)(a). Second priority is given to land that is adjacent to the UGB that is identified as an "exception area" or "nonresource land." ORS 197.298(1)(b). Third priority is given to land that has been designated as "marginal land." ORS 197.298(1)(c). And fourth priority is given to land designated for agriculture, forestry, or both. ORS 197.298(1)(d).

LCDC has exclusive jurisdiction to review the evaluation, work program, and completed work program tasks for compliance with statewide land use planning laws and goals. ORS 197.644(2). LCDC's decision is subject to judicial review "in the manner provided in ORS 197.650." ORS 197.644(3)(a). ORS 197.650, in turn, provides that an LCDC order may be "appealed to the Court of Appeals in the manner provided in ORS 183.482," that is, the provision of the Oregon Administrative Procedures Act pertaining to review of contested cases.

B. *Metro's periodic review and work program*

Metro is a local government, *see* ORS 174.116(1) (defining "local government"), that has been charged with coordinating regional land-use planning in the area encompassed by Multnomah, Clackamas, and Washington counties. ORS 195.025. It is expressly charged with the responsibility to complete the analysis of regional needs and buildable land supply that we have described, subject to specific deadlines not applicable to other local governments. ORS 197.299.

On July 28, 2000, LCDC approved Metro's periodic review work program. "Work Task 2" of that work program required Metro to estimate population and employment growth over the next 20 years, to assess the capacity of the existing regional UGB, and, if necessary, to amend the UGB. The work task included a number of "subtasks" calling for analysis of more specific aspects of population and employment growth and determination of regional needs.

As part of Work Task 2, Metro produced estimates of population and employment growth to the year 2022. It analyzed the capacity of the land within the existing UGB to accommodate the demands driven by the estimated increases

in population and employment. It also determined that it is necessary to expand the UGB by 18,638 acres to accommodate those demands.

More specifically, Metro forecast a population increase of 525,000 people by the end of the forecast period. Metro estimated that, to accommodate that growth, approximately 220,700 new dwelling units would be required. Metro determined that, of that total, up to 183,300 new dwelling units could be developed by using existing capacity and adopting additional measures to achieve greater housing densities. The balance, Metro concluded, required the addition of approximately 15,047 acres to the UGB.

Metro also forecast an increase of approximately 355,000 jobs by 2022. It determined that employment needs will require approximately 14,240 acres of land—4,874 acres of commercial land and 9,366 acres of industrial land. Some of that need, Metro concluded, required adding acreage to the UGB.

Metro conducted a study of alternative locations as sources of the additional acreage, the "2002 Alternative Analysis Study." The study includes an examination of approximately 75,000 acres in 94 different "study areas." It entails an evaluation of each of the study areas in light of the requirements of the Statewide Planning Goals, state statutes, administrative rules, and local government ordinances. On the basis of that examination, Metro settled on a number of specific study areas for inclusion within an amended UGB.

LCDC reviewed the completeness and sufficiency of Metro's Work Task 2 and its compliance with the Statewide Planning Goals. It entertained objections and exceptions to the work task submitted by petitioners. In the end, LCDC concluded that, in substantial part, Work Task 2 was complete, sufficient, and complied with the Statewide Planning Goals. In a 50-page order, LCDC detailed its review, its reasoning, and its disposition of the objections and exceptions. That order is now the subject of our review.

## II. ANALYSIS

As we have noted, petitioners advance a number of assignments of error. We address each of them in turn, noting additional facts as necessary to explain the parties' arguments and our disposition of them. As we have noted, those assignments generally concern the adequacy of Metro's determinations with respect to population and employment growth and with respect to the need to include a number of particular parcels within an expanded UGB to meet that growth.

### A. *Standard of review*

Before embarking on an evaluation of the parties' assignments of error, we address a preliminary issue of overarching significance, namely, our standard of review. As we have noted, ORS 197.650(1) provides that we review LCDC's order "in the manner provided in ORS 183.482." With respect to this court's review of final orders, that provision of the Administrative Procedures Act provides:

"(a) The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law.

"(b) The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:

"(A) Outside the range of discretion delegated to the agency by law;

"(B) Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C) Otherwise in violation of a constitutional or statutory provision.

"(c) The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a

finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

ORS 183.482(8). In conducting the review that the statute describes, we are confined to the record of the agency's action. ORS 183.482(7).

In this case, petitioners generally contend either that Metro's decisions failed to comply with the law—in particular with statewide planning goals and with Metro's own ordinances—or that Metro's decisions were not supported by substantial evidence. The former contention poses no particular difficulty in terms of articulating and applying our standard of review—either Metro complied with the law or it did not. The latter, however, requires a bit more explanation.

LCDC suggests that, notwithstanding ORS 197.644(3)(a) and ORS 183.482, the substantial evidence standard may not be appropriate. According to LCDC, the Metro decisions at issue are legislative in nature and thus are not amenable to the sort of substantial evidence standard that ordinarily applies to quasi-judicial decision-making. LCDC suggests that we should review the Metro decisions in this case to determine whether they are supported by evidence that is " 'of a type commonly relied upon by reasonably prudent persons in the conduct of their serious affairs.' " (Quoting ORS 183.450(1).)

In *1000 Friends of Oregon v. LCDC (Lane Co.)*, 305 Or 384, 404-05, 752 P2d 271 (1988), the Supreme Court addressed the standard of review that applies to review of an LCDC order acknowledging a local comprehensive plan for compliance with the Statewide Land Use Planning Goals. We had applied a substantial evidence standard of review. The court held that we were correct in doing so:

"The Court of Appeals correctly identified its responsibility to apply a substantial evidence test to decisions of the LCDC when a challenge to the evidence has been properly raised. ORS 197.650 provides that decisions of the LCDC shall be appealed to the Court of Appeals in the manner provided in ORS 183.482. ORS 183.482(8)(c) specifically states that '[t]he court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record.' * * * In choosing to direct this court

and the Court of Appeals to consider acknowledgment orders under ORS 183.482, the legislature deliberately chose a particular scope of review for courts reviewing acknowledgment orders."

In this case, too, ORS 197.650 directs that LCDC's decision may be appealed "in the manner provided in ORS 183.482." As the court explained in *1000 Friends of Oregon*, that clearly implicates the substantial evidence standard that is described in the statute.

Even assuming for the sake of argument that LCDC is correct that there is something distinguishable in the nature of the particular decisions at issue in this case that makes them more "legislative" than, say, an acknowledgment order, we do not understand why that requires a different standard of review. It is true that, as a general rule, legislative decisions need not be supported by findings. Nevertheless, as we explained in *Citizens Against Irresponsible Growth v. Metro*, 179 Or App 12, 16 n 6, 38 P3d 956 (2002),

> "there are some instances where controlling statutes, rules, or ordinances specifically require findings to show compliance with applicable criteria. Also, to permit LUBA and us to exercise our review functions, there must be enough in the way of findings or accessible material in the record of the legislative act to show that applicable criteria were applied and that required considerations were indeed considered."

In this case, as we have noted, Metro was required to justify its decisions to expand the UGB and, more particularly, to propose specific areas for inclusion within the expanded UGB, under various criteria expressed in state law, administrative rules, and local ordinances. Thus, whether or not the decisions were, strictly speaking, "legislative" in nature, they are subject to review for adequate support in the record. LCDC does not explain, and we do not understand, how that review differs in any significant way from the substantial evidence review that is described in ORS 183.482, at least in the context of this case.

When we say that the substantial evidence test applies, however, we do not suggest that we review the record

on our own to determine whether Metro's decisions, in fact, satisfied that standard. As we explained in *Citizens Against Irresponsible Growth*, "[o]ur role is to determine whether [the agency] applied the correct legal test in deciding whether Metro's decision is supported by substantial evidence." 179 Or App at 21.

### B. *Petitioners' assignments of error*

As we have noted, petitioners' challenges come to us in essentially two categories: (1) LCDC erred in concluding that Metro's analysis of regional needs is supported by substantial evidence; and (2) LCDC erred in concluding that Metro adequately justified including within an expanded UGB various specific parcels of land. We address those contentions in turn.

#### 1. *Metro's analysis of regional needs*

Petitioners the City of West Linn, Andrea L. Hungerford, and Richard G. Cohn-Lee contend that LCDC erred in concluding that Metro's analysis of regional needs is supported by substantial evidence in three respects. First, they contend that Metro employed flawed population forecasting. Second, they contend that Metro used an erroneous "capture rate," that is, the portion of the estimated population growth that is predicted to occur within the UGB in relation to the total amount of growth in the region. Third, they contend that Metro understated the historic household size in estimating regional needs.

In each case, petitioners contend that Metro's analysis runs afoul of Statewide Planning Goal 14, in particular, the first two factors. The purpose of Goal 14 is "[t]o provide for an orderly and efficient transition from rural to urban land use." It provides that "[u]rban growth boundaries shall be established to identify and separate urbanizable land from rural land." It further provides that establishment of a UGB and changes of the boundaries of a UGB must be based on consideration of a number of factors:

"(1) Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

"(2) Need for housing, employment opportunities, and livability;

"(3) Orderly and economic provision for public facilities and services;

"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5) Environmental, energy, economic and social consequences;

"(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and

"(7) Compatibility of the proposed urban uses with nearby agricultural activities."

The first two factors commonly are referred to as "need factors," while the latter five are known as "locational factors." Petitioners' contentions focus primarily on the extent to which Metro's needs analysis adequately considered the two need factors.

### a. Population forecasting

In its analysis of regional needs over the next 20 years, Metro forecast a 1.6 percent average annual increase in population within the region. It concluded that, by the year 2022, another 744,200 residents would be added to the region.

Petitioners asserted to LCDC that Metro's forecast is too high and thus overstates the need for additional land within the UGB. According to petitioners, population figures from the Oregon State Office of Economic Analysis (OEA) show a projected population increase for Multnomah, Clackamas, and Washington counties of only 1.225 percent per year and an average annual growth rate for a 20-year period of 1.28 percent. In addition, they rely on a Port of Portland projection of 1.5 percent.

Metro's supporting evidence included analysis by a Metro economist who concluded that the Metro model was superior to two other forecasts showing a lower growth rate. The economist's evidence reviewed population changes from

1850 to 2000 showing annual percentage rates of change ranging from 1.0 percent during the depression to 6.4 percent in 1860 to 1870 and 2.4 percent over the 1990s. According to the economist, at no point in history has population growth remained "anemic" for more than a decade.

LCDC rejected petitioners' challenge. Among other things, LCDC noted that the projected rate of 1.6 percent is less than the historic 30-year rate of 2 percent and added that the region, over several expansionary and recessional cycles, has demonstrated an average growth rate higher than that projected. Also, LCDC noted that Metro's forecast was found to be sound under the review of peer evaluators, including a representative of the OEA. LCDC concluded that Metro's use of a projected growth rate of 1.6 percent was supported by substantial evidence.

On review, petitioners essentially repeat the arguments that they advanced before LCDC.

There is no question that petitioners have submitted evidence that would support a lower estimate of annual average population growth in the region. That, however, is not the standard that LCDC was required to apply in evaluating Metro's population estimate. As we have noted, the applicable standard is one of substantial evidence, which is the evidence that, after reviewing the whole record, a reasonable person would find adequate to support a finding. ORS 183.482(8)(c). In this case, Metro's economist's opinion supports the use of a slightly higher growth rate than the figure that petitioners advocate. Petitioners have not demonstrated that Metro's economist's evidence is unworthy of belief, and they offer no reason to conclude that LCDC's approval of Metro's use of that evidence was mistaken. Persons of reasonable understanding could—and, in fact, do—differ over the evidence that petitioners offered and that Metro relied upon. Nothing, however, suggests that the conclusions Metro drew from the evidence were unreasonable. We find no error in LCDC's approval of Metro's population estimate.

b. Capture rate

Metro's analysis of the region's future needs was based, in part, on a "capture rate," which it defined as the

"proportion of growth [that] is the fraction of dwelling units predicted to occur in the UGB relative to the total amount of growth overall in the four-county region (Multnomah, Clackamas, Washington and Clark Counties)." In this case, Metro employed a capture rate of 68 percent.

Several petitioners argued to LCDC on a variety of grounds that the capture rate that Metro employed is erroneous, either because it was too low or too high. LCDC rejected all of those arguments, concluding that Metro's capture rate was supported by substantial evidence.

Petitioners now argue that the capture rate that Metro employed is erroneous because it appears to have calculated the capture rate based on population within its jurisdictional boundary rather than the existing UGB. Because Metro's jurisdictional boundary includes significantly more land than does the UGB, petitioners argue, the capture rate that it calculated is too high. Petitioners suggest a capture rate of approximately 60 percent.

Metro responds that its "2002-2022 Urban Growth Report: A Residential Land Need Analysis" plainly refutes petitioners' arguments. According to Metro, the report repeatedly states that it calculated the rate based upon the population within the UGB.

Whether petitioners' claim of error was preserved is debatable. Certainly, they have not included in their briefing a demonstration that the arguments that they now advance to us were advanced to LCDC. *See* ORAP 5.45. In any event, nothing that they have suggested on review persuades us that LCDC erred in finding substantial evidence supporting the capture rate that Metro employed.

 c. Household size

In calculating regional housing needs, Metro estimated that households will average 2.385 people per household over the next 20 years. Petitioners object to the use of that figure, arguing that simple calculation demonstrates that, in fact, the average number of people per household over the last 20 years has been 2.52.

So far as we can tell, petitioners did not raise that issue before LCDC, and LCDC did not address it. We reject the argument without further discussion.

2. *Particular study areas*

We turn to petitioners' contentions that, even if additional land is needed to accommodate anticipated growth in the next 20 years, LCDC erred in concluding that Metro properly included various specific parcels of land—"study areas"—within the proposed expanded UGB as the means of meeting that need. In general, each of the petitioners contends that inclusion of a particular study area is inappropriate after considering various statewide planning goals.

a. Study Area 24

Petitioners Hungerford and Cohn-Lee contend that LCDC erred in approving Metro's decision to include Study Area 24, located on the eastern edge of Oregon City, within the amended UGB. It is an area that contains several streams and areas of steep slopes. According to petitioners, including Study Area 24 is inconsistent with Statewide Planning Goals 1, 6, 7, and 12.

We begin with petitioners' Goal 1 argument. Goal 1 and LCDC's implementing rules call for citizen involvement "in all phases of the planning process." In this case, Metro sent individual notices to 105,000 property owners and sent 120,000 utility inserts to area ratepayers several months before its decision, advising the public of the decision-making process and the opportunities for public input. Petitioners argue that citizen participation in the Metro planning process was essentially a sham because the actual decisions were "based upon discussions that citizens were not notified of or invited to" and were "rubber-stamped" by Metro.

LCDC rejected the Goal 1 challenge after concluding that Metro complied with all process required by law. Petitioners have not suggested any basis for concluding that LCDC erred in that regard, and we reject their argument without further discussion.

We turn to petitioners' argument that including Study Area 24 in the UGB is contrary to Goals 6 and 7. Goal 6 is "[t]o maintain and improve the quality of the air, water and land resources of the state." Goal 7 is "[t]o protect people and property from natural hazards." Petitioners argue that including Study Area 24 in the UGB contradicts both of those goals in that the area is "geographically challenged due to steep slopes and natural resource issues." Petitioners complain that Metro failed to study or consider the effects of including Study Area 24 on wildlife, erosion, and water resources.

Metro insists that, in fact, it did study those effects in its "2002 Alternatives Analysis" and that, on the basis of that study, it weighed the consequences of urbanization in the study area against all the other locational factors required under Goal 14. LCDC accepted that analysis and concluded that Metro complied with all of the applicable goals.

■ In our view, petitioners have failed to demonstrate that LCDC erred. They have not demonstrated that LCDC was mistaken in determining that there was substantial evidence as to any relevant findings. And they have failed to demonstrate that LCDC erred in construing or applying any applicable law or goal. Their argument is that, because Study Area 24 is "geographically challenged," it cannot be included within a UGB. Nothing in the Statewide Planning Goals says that. The fact that a particular study area poses particular environmental challenges is an important consideration, to be sure, but it is just that—a consideration to be weighed with all the others required by the goals and applicable law.

There remains petitioners' Goal 12 argument. Goal 12 is "[t]o provide and encourage a safe, convenient and economic transportation system." Petitioners contend that including Study Area 24 within the UGB runs afoul of that goal because the real reason for including the study area is to provide land for a connector road when the need for the road has never been established. In fact, petitioners contend, building such a connector road would exacerbate traffic problems in the study area.

Metro contends that the need for a connector road is only one factor that it considered in deciding to include Study Area 24 and that, in any event, substantial evidence supports the determination that such a road is, in fact, needed.

LCDC rejected petitioners' Goal 12 argument summarily. It stated that any concerns about the effect of actually constructing a road are more properly directed to the amendment of Oregon City's transportation plan, which is the proper mechanism to ensure that adverse effects on capacity and public safety will be addressed.

Again, petitioners have failed to demonstrate reversible error. They have not demonstrated that Metro failed to consider any of the factors that are required to be considered under Goal 12, nor have they explained why LCDC erred in evaluating Metro's consideration of those factors for adequate support in the record. It appears that they simply disagree with Metro and with LCDC. That is not a basis for reversal.

b. Study Area 37

We begin with the City of West Linn's argument that LCDC erred in approving Metro's inclusion of a 373-acre parcel in the West Linn area designated "Study Area 37." It is adjacent to the existing UGB and encompasses exception land, that is, land for which an exception to resource goals has been taken. As such, it is second in priority for inclusion in an amended UGB, behind only urban reserve land. ORS 197.298(1)(b).

The city objected to the inclusion of Study Area 37 on the grounds that, among other things, the area is characterized by steep slopes and is difficult to provide with water, sewer, storm water, and transportation services; that including the area will result in adverse transportation effects; and that other areas would be easier to serve. The city noted that it has expressly informed Metro by letter that it has no desire to provide services to the area and argues on that basis that the area cannot be provided with public services in an "orderly" fashion, as Goal 14 requires.

Metro determined that it was possible to serve the area in an orderly manner with water, sewer, storm water, and transportation services based in part on the city's past willingness to provide services to the area. It acknowledged that the area was difficult to moderately difficult to serve because of steep slopes in the southern and western portions. But it ultimately concluded that services could be provided in an orderly manner because the area is adjacent to the city.

LCDC rejected the city's challenge to the inclusion of Study Area 37. It concluded that difficulty in providing services, by itself, is not determinative of whether land may be made available for urbanization. Particularly because the land at issue is an exception area, LCDC explained, it is to be anticipated that providing service is relatively more difficult than in other areas. With respect to the city's purported refusal to provide services, LCDC reasoned that merely because the City of West Linn expressed disinterest in providing services does not mean that services will not be provided in an orderly manner. With respect to the city's argument that Metro failed to demonstrate that other areas would not be better choices, LCDC noted that, indeed, "Metro did not make findings of fact as to why study areas of equal hierarchy under ORS 197.298(1) were not selected under application of the locational factors[.]" LCDC nevertheless concluded that, because Metro stated reasons for including Study Area 37, Metro satisfied the law.

On review, the city essentially repeats the arguments that it made before LCDC, namely, that including Study Area 37 is inconsistent with the "orderly" provision of services requirement of Goal 14 because the area is too difficult to serve—especially in light of the fact that the city has expressed no desire to provide the services—and that, in deciding to include Study Area 37, Metro failed to demonstrate that the area is better than alternative sites, as its own code requires.

■ We agree with LCDC that the Goal 14 requirement of "orderly" provision of services is not the exclusive determinant of a decision to include land within an expanded UGB. No single factor controls. We also agree that the city's disinterest in providing services to Study Area 37 does not

necessarily mean that services cannot be provided in an orderly fashion.

The city's argument that Metro failed to comply with its own code in demonstrating that Study Area 37 is better than alternative sites, however, cannot so quickly be rejected. Section 3.01.020 of the Metro Code provides, in part:

"(a) The purpose of this section is to address ORS 197.298, Goals 2 and 14 of the statewide planning goals and [the Regional Urban Growth Goals and Objectives] RUGGO. This section details a process which is intended to interpret Goals 2 and 14 for specific application to the district UGB. Compliance with this section shall constitute compliance with ORS 197.298, statewide planning Goals 2 and 14 and the [RUGGO].

"(b) While all of the following Goal 14 factors must be addressed, the factors cannot be evaluated without reference to each other. Rigid separation of the factors ignores obvious overlaps between them. Demonstration of compliance with one factor or subfactor may not constitute a sufficient showing of compliance with the goal, to the exclusion of the other factors when making an overall determination of compliance or conflict with the goal. For legislative amendments, if need has been addressed, the district shall demonstrate that the priorities of ORS 197.298 have been followed and that *the recommended site was better than alternative sites*, balancing factors 3 through 7."

(Emphasis added.) The code then addresses each of the Goal 14 locational factors and describes the qualities or circumstances Metro should consider in evaluating a site for inclusion in the UGB. Factors 3 and 4 include guidance for choosing the "best" site or one to be "favorably considered" when evaluating alternative sites. For example, under Factor 3, relating to the orderly and economic provision of public facilities and services, the "best site" is the one with lowest net increase in the total cost for provision of all urban services when compared to other sites. Factor 4 states that an area shall be more favorably considered if it can be shown that certain transit efficiencies may be developed.

■ As we have noted, LCDC observed that Metro "did not make findings of fact as to why study areas of equal hierarchy under ORS 197.298(1) were not selected." LCDC concluded that that did not matter, because Metro did state its reasons for including Study Area 37. In so concluding, LCDC erred. Merely stating reasons for including an area is not what the Metro Code requires. The ordinance requires that, in addition, Metro "demonstrate that the priorities of ORS 197.298 have been followed and that *the recommended site was better than alternative sites.*" (Emphasis added.) It simply does not necessarily follow that, having offered what may be very good reasons for including Study Area 37, Metro satisfied its obligation to explain why that area is better than alternative sites. We therefore reverse and remand for reconsideration of that aspect of LCDC's decision.

 c. Study Areas 85 and 87

 Petitioner Greg Malinowski, dba Malinowski Farms, argues that LCDC erred in approving Metro's decision to include Study Areas 85 and 87, which, along with nearby Study Areas 84 and 86, are known as the "Bethany Expansion Area." Study Area 85 supports field or row crops, and Study Area 87 supports nursery stock, field crops, and pasture land. Both areas are zoned for farm use. Neither is covered by a goal exception and so both are of a lower priority for inclusion in a UGB than lands for which an exception has already been taken. The areas included, then, are "fourth" in priority under the statute and may be included only if areas of higher priority are "inadequate to accommodate" the amount of land needed. *See* ORS 197.298(1)(d), (3).

 Petitioner advances three arguments in support of reversing LCDC's approval of Metro's decision to include the Bethany Expansion Area: (1) LCDC erred in concluding that it is permissible to include such fourth-priority resource land without determining that there was inadequate land of higher priority anywhere in the region; (2) other study areas were more suitable for inclusion in the UGB; and (3) LCDC erred in concluding that Metro satisfied the statutory requirement that land of lower priority may be included within a UGB if "maximum efficiency of land uses" requires it. We address those arguments in order.

We begin with petitioner's first argument, concerning prioritization of lands under ORS 197.298. As we have noted, that statute provides that, "[i]n addition to any requirements established by rule addressing urbanization, land may not be included within an urban growth boundary," except under a stated list of priorities. Initial priority is given to urban reserve land. ORS 197.298(1)(a). Then, if the urban reserve land "is inadequate to accommodate the amount of land needed," second priority goes to exception land. ORS 197.298(1)(b). If such exception land is similarly "inadequate to accommodate the amount of land needed," third priority goes to marginal land. ORS 197.298(1)(c). And, if such marginal land "is inadequate to accommodate the amount of land needed," fourth priority goes to agriculture or forestry land, or both. ORS 197.298(1)(d).

In this case, petitioner argues that, before resorting to fourth-priority agriculture land such as Study Areas 85 and 87, Metro was required to conclude that none of the areas under consideration of a higher priority, wherever they may be located, provided adequate acreage. In other words, petitioner argues that Metro must exhaust the available supply of urban reserve, exception, and marginal land *anywhere adjacent to the UGB* before agricultural or forestry lands may be considered for inclusion within a UGB. Because Metro's alternative analysis shows that there are, in fact, other such areas available, petitioner argues, it is unlawful to include Study Areas 85 and 87. In support of that construction of the statute, petitioner invokes our opinion in *D. S. Parklane Development, Inc. v. Metro*, 165 Or App 1, 17-18, 994 P2d 1205 (2000).

LCDC rejected that construction of the statute. According to LCDC, the statute applies "[i]n addition to any requirements established by rule addressing urbanization." ORS 197.298(1). Under these circumstances, Goal 14, LCDC stated, is just such a rule, and that goal requires a local government to consider various locational factors in determining whether a parcel is adequate to meet planning needs. Thus, LCDC concluded, the fact that there may be higher priority land somewhere else in the region does not necessarily limit a local government's authority to include lower priority land within a UGB.

On review, petitioner insists that LCDC erred in so construing ORS 197.298(1). Metro argues that LCDC was correct in concluding that the statute permits inclusion of lower priority land as long as it is demonstrated that "available higher priority land cannot reasonably accommodate the use proposed for urbanization."

We agree with Metro that LCDC correctly construed ORS 197.298(1). The statute provides that progressively lower priority lands may be included within a UGB if higher priority land "is inadequate to accommodate the amount of land needed." The operative term is "inadequate." Whether there is adequate land to serve a need may depend on a variety of factors. In particular, the adequacy of land may be affected by locational considerations that must be taken into account under Goal 14. As LCDC correctly noted, ORS 197.298(1) expressly provides that the priorities that it describes apply "[i]n addition to any requirements established by rule addressing urbanization," such as the locational factors described in Goal 14. As a result, the fact that other, higher priority land may exist *somewhere* adjacent to the UGB does not necessarily mean that that land will be "[ ]adequate to accommodate the amount of land needed," if using it for an identified need would violate the locational considerations required by Goal 14. In other words, the statutory reference to "inadequate" land addresses suitability, not just quantity, of higher priority land.

Nothing in our decision in *D. S. Parklane Development, Inc.*, suggests that the proper focus is on the quantity of land alone, without respect to its location or other forms of suitability to the needs of the particular area. At issue in that case was the proper construction and application of an administrative rule, since amended, that set out the methods and priorities for designation of lands that are to comprise the urban reserve. The rule established a system of priorities for inclusion within the urban reserve, with first priority going to exception or nonresource lands adjacent to a UGB, second priority going to marginal lands, third priority going to secondary lands, and fourth priority going to agricultural or forestry land, or both. OAR 660-021-0030(3) (Dec 31, 1996). Under the rule, local governments are permitted to include land of lower priority only "[i]f land of higher priority

is inadequate to accommodate the amount of land estimated" to be at least a 10-year supply of developable land. OAR 660-021-0030(4) (Dec 31, 1996). We concluded that the rule required that "its numbered provisions be applied sequentially," that is, that the local government must determine that land of a higher priority is inadequate before turning to land of a lower priority. *D. S. Parklane Development, Inc.*, 165 Or App at 20. We did not address whether, in determining the adequacy of the higher priority land, the sole determinant is the quantity of such land anywhere bordering the UGB. In short, that decision does not assist petitioner.

We turn, then, to petitioner's second argument, concerning the availability of alternative sites. Petitioner argues that LCDC erred in approving Metro's decision to include the Bethany Expansion Area because Metro had identified other areas as more able to accommodate urban services. Petitioner notes that, in Metro's Alternatives Analysis, the Bethany area was evaluated by comparison with only two other areas, Study Areas 65 and 82.

Metro concluded that the Bethany Expansion Area was more consistent with the Goal 14 locational factors and Metro's related suitability considerations than any of the alternative sites. The express basis for Metro's inclusion of the Bethany area was that it was comparatively easier to serve as a unit than other exception land. Metro said that the Bethany area was "more consistent with and more fully implement[s] Goal 14, Factors 3-7[,] and Metro's related suitability considerations than any of the alternative sites that were analyzed." The cited factors included proximity to the existing Bethany Town Center and to Portland Community College's Rock Creek Campus, the fact that land inside the UGB in the Bethany area has been fully developed, the availability of service by Tri-Met bus lines, and the distance from the Bethany area to downtown Portland and employment areas around Hillsboro.

LCDC concluded that

"[t]he specific comparison of agricultural compatibility of Study Areas 84 and 86 with Study Areas 65 and 82 was in addition to the Alternatives Analysis, which compared all 94 study areas. Metro found 'the Bethany area compares

more favorably than other expansion study area[s] that were not chosen for urbanization *such as* areas 65 and 82.' "

(Emphasis in original.)

Beyond merely expressing disagreement with Metro's analysis of the relative merits of including the Bethany area in the UGB, petitioner does not offer a legal or factual basis to conclude LCDC erred in approving it. We therefore reject petitioner's argument.

There remains petitioner's argument that LCDC misconstrued ORS 197.298(3) in approving the inclusion of land of lower statutory priority. Petitioner begins by noting that LCDC relied primarily on ORS 197.298(3)(c), authorizing the inclusion of such land if "[m]aximum efficiency of land uses within a proposed urban growth boundary requires inclusion of lower priority lands in order to include or to provide services to higher priority lands." Petitioner asserts that Metro's findings and the evidence do not support a determination that including the exclusive farm use land areas in the Bethany area meets that standard. According to petitioner, the evidence and analysis support inclusion of only the southern portion of Study Area 85 and do not support inclusion of any of Study Area 87. Petitioner relies on testimony that, it argues, demonstrates that including the northern portion of Study Area 85 and all of Study Area 87 will not maximize the efficiency of land uses on high priority Bethany lands.

Metro relied on evidence that inclusion of the Bethany area between two exception areas, 84 and 86, would allow installation of more efficient sewer, water delivery, and transportation systems. Metro explained:

"Planning and developing all of the Bethany area satisfies the maximum efficiency test in two important ways: first, it enables areas 84N and 86 to be efficiently urbanized, and second, it creates the greatest opportunity to plan and design the entire 778 acres as a community with the greatest flexibility and opportunities to satisfy Metro's acknowledged urbanization objectives and the suitability factors of Goal 14. The Bethany expansion area will have clear boundaries that serve to both visibly highlight the line separating urban and rural uses, and to also serve as a buffer between urban development and rural uses. NW 185th

Avenue, Abby Creek and its adjoining riparian zone and slopes and the powerline easement coupled with the Multnomah County boundary line all serve to clearly demarcate and buffer the proposed expansion area."

Metro further explained its inclusion of Study Area 87 by noting that limiting the expansion to lower priority lands in Study Area 85W and the portion of Study Area 85E south of Brugger Road would allow for efficient urbanization of two higher priority areas and would place the UGB boundary line in the middle of the expansion area. However, it noted that,

"[w]hile that would adequately allow for road and utility connections between the two exception areas, the evidence shows that greater efficiencies and greater opportunities to design a whole community can be achieved if the boundary line between the two exception areas is moved further north. For example, the evidence shows that the northern portion of Brugger Road could be extended as a connection between the two expansion areas and that greater efficiencies can be achieved by utilizing that as the northern UGB boundary between the two exception areas. To achieve maximum efficiency in the planning and development of the exception lands, the Council has concluded it is appropriate to include area 87 in the Bethany expansion for all of the reasons discussed above."

LCDC rejected petitioner's challenge:

"Metro's proposed 'Bethany area' expansion in Washington County is comprised of Study Areas 84, 85, 86, and a portion of 87. Study Areas 84 and 86 are exception areas. Study Areas 85 and 87 are designated farmland under Goal 3, but because they border and separate Study Areas 84 and 86, Metro analyzed whether urbanization of these farmlands was necessary to efficiently urbanize and to provide services to Study Areas 84 and 86. Metro concluded that it needed to include Study Area 85 and a portion of Study Area 87 in order to provide services in a way that maximizes the efficiency of land use in adjacent Study Areas 84 and 86. ORS 197.298 provides that Metro may not include Study Area 85 and the portion of Study Area 87 farmland in the UGB unless it can demonstrate that '[m]aximum efficiency of land uses within a proposed urban growth boundary requires inclusion of lower priority lands in order to include or to provide services to higher priority lands.' ORS

197.298(3)(c). Metro has made findings based on substantial evidence to establish that greater efficiencies and greater opportunities to design a whole community can be achieved by including the resource lands under ORS 197.298(3)(c)."

On review, petitioner again contends that Metro was simply wrong in evaluating the evidence the way that it did and that LCDC was wrong in agreeing with Metro. Petitioner also suggests that Metro and LCDC erred in apparently justifying inclusion of farmland in the UGB as a way to promote town centers. We do not, however, understand that Metro's justification rests on promotion of town centers, but on a combination of factors including, as noted, the area's proximity to the existing Bethany Town Center and to Portland Community College facilities, the fact that the Bethany area inside the UGB is already developed, the availability of transportation resources, the areas' relative closeness to downtown Portland, an agreement for annexation of a portion of Study Area 85 to the City of Beaverton, the conclusion that areas 84 and 86 cannot efficiently be provided with services without also including Study Areas 85 and 87 in the UGB, and the conclusion that a school site in Washington County has already been approved for Study Area 85W and should not be limited to a stand-alone site, as it would "create an isolated pocket of urbanization not connected to or compatible with any adjoining urbanization." Petitioner does not offer a convincing argument that LCDC erred in accepting those reasons as adequate.

For all of the above reasons, we reject petitioner's argument that Metro failed to justify inclusion of statutorily lower priority Bethany Expansion Area land into the UGB under ORS 197.298(3)(c). Metro's findings adequately explain why efficiency of land uses within the proposed UGB expansion area requires inclusion of the lower priority land in terms of service delivery and establishing a buffer area between remaining rural land and the nearby urban areas. LCDC did not err in approving Metro's expansion in this area.

### d. Study Area 94

Petitioners Friends of Forest Park, Arnold Rochlin, and Jim and Cheryl Coon challenge LCDC's approval of Metro's decision to include Study Area 94, which consists of approximately 517 acres between Forest Park and N.W. Skyline Boulevard, mostly within the City of Portland. A substantial portion of the land consists of steep (25 percent) slopes and environmental zoning overlays. Much of the area is forested and contains large parcels that are designated as parks or open spaces and therefore are not buildable. It is an exception area, however, and—second only to land designated as urban reserve—is of high priority for inclusion in the UGB. Moreover, it is nearly surrounded by the existing UGB and is relatively distant from agricultural lands.

Petitioners argue that the inclusion of Study Area 94 violates Goal 14 in that the area would not satisfy a need for urbanizable residential land. They contend that only 110 of the 517 acres are vacant and buildable and that, if those buildable acres are developed, only 55 new dwellings would be permitted; when combined with existing development that would result in a density of one house per 5.5 acres, a density that they contend would be considered "rural" under most circumstances. Petitioners also argue that Metro failed to comply with its own code in neglecting to demonstrate that Study Area 94 is better suited for inclusion within the UGB than other areas of equal priority under ORS 197.298.

Metro found that the area is indeed somewhat difficult to serve and that urbanization of the area presents moderate adverse economic, energy, environmental, and social consequences. Metro, in fact, ranked the area as "Least" in its "Goal 14 Alternatives Analysis" and "Least" in its "Overall Suitability W/2040," a summary of various factors under its "2040 Growth Concept," itself part of its Regional Framework Plan. It nevertheless concluded that serving the area was feasible and would result in little impact on agricultural lands. Metro found particularly important the fact that development of the area would produce housing within two miles of the Bethany Town Center, consistently with Metro's policy of supporting town centers.

LCDC rejected petitioners' challenges to the inclusion of Study Area 94. It explained that, although the area is difficult to serve, the record generally supports Metro's determination that it is nevertheless feasible and that its consideration of all of the Goal 14 factors was adequate. On review, petitioners repeat the arguments that they asserted to LCDC.

■ At the outset, we reject petitioners' argument that there is something inherently impermissible about including low-density land within a UGB. It appears that their argument is based on the notion that, because Goal 14 prohibits placing urban uses and densities on rural land, it follows that rural uses and densities are impermissible in urban land. The argument does not necessarily follow. Nothing in any rules of which we are aware prohibits large acre lots within urban growth boundaries. Petitioners refer to OAR 660-004-0040, which treats certain lots of two acres as "rural residential areas." The rule, however, applies by its terms to areas *outside* a UGB.

■ We also reject petitioners' contention that Study Area 94 may not be included within the amended UGB because it is difficult to serve. As LCDC correctly explained, difficulty in providing service is but one consideration and is not determinative under the analysis required under Goal 14. The goal does not require ease of service. It requires that the local government consider that there be an orderly and economic provision of service along with other "locational" considerations.

■ Petitioners are correct, however, that LCDC erred in rejecting their argument that Metro failed to comply with its ordinance in deciding to include Study Area 94. The particular ordinance is the same one that the City of West Linn, Hungerford, and Cohn-Lee invoked regarding Study Area 37, that is, Metro Code 3.01.020, which requires that Metro "demonstrate that the priorities of ORS 197.298 have been followed and that *the recommended site was better than alternative sites*, balancing factors 3 through 7" of Goal 14. (Emphasis added.) As we have noted, the ordinance includes explanations of how the seven Goal 14 factors are to be applied and, as applicable to this matter, mandates that the

district "demonstrate" that the statutory priorities for land to be incorporated in UGBs have been followed and that the recommended site was "better than alternative sites," after balancing Goal 14 Factors 3 through 7.

In this case, LCDC concluded that Metro's analysis of alternative sites was adequate, but it did not explain how that analysis complied with Metro Code 3.01.020. Moreover, the parties have not brought to our attention anything in the record that suggests that, in fact, Metro engaged in the demonstration that its ordinance requires. Once again, Metro contends that the record is adequate to support its determination that Study Area 94 is a good choice for inclusion in the UGB. But that is not the question that the ordinance requires it to answer, which is whether Study Area 94 is "better than alternative sites." Particularly in this case, in which Metro itself apparently rated the area as "least" in terms of suitability, efficiency of land uses, and ease of services, it is reasonable to expect Metro to explain how it arrived at its conclusion that the same area is "better than alternative sites" for inclusion within the UGB. We therefore reverse and remand for reconsideration of that aspect of the decision.

Reversed and remanded for reconsideration of decision to include Study Areas 37 and 94; otherwise affirmed.