Argued and submitted November 19, 2007, reversed and remanded February 6, 2008

Jerry L. HILDENBRAND;
Nancy A. Hildenbrand; Ken Imamura; Joel K. Imamura;
H. Peter Eilers; Kay G. Eilers; Donna D. Roth;
Kenneth W. Roth; Kevin L. Armstrong; Carol J. Huntington;
Michael C. Huntington; Millicent A. Burton-Funk;
Kenneth H. Funk II; Bruce Thomson; Shawn Barrett;
and Daniel Barrett,
*Petitioners,*

*v.*

CITY OF ADAIR VILLAGE
and JT Smith, Inc.,
*Respondents.*

Land Use Board of Appeals
2007092

Jerry L. HILDENBRAND;
Nancy A. Hildenbrand; Ken Imamura; Joel K. Imamura;
H. Peter Eilers; Kay G. Eilers; Donna D. Roth;
Kenneth W. Roth; Kevin L. Armstrong; Carol J. Huntington;
Michael C. Huntington; Millicent A. Burton-Funk;
Kenneth H. Funk II; Bruce Thomson; Shawn Barrett;
and Daniel Barrett,
*Petitioners,*

*v.*

BENTON COUNTY
and JT Smith, Inc.,
*Respondents.*

Land Use Board of Appeals
2007093

A136850

177 P3d 40

Jannett Wilson argued the cause for petitioners. With her on the brief was Goal One Coalition.

Roger A. Alfred argued the cause for respondent JT Smith, Inc. With him on the brief were Michael C. Robinson and Perkins Coie LLP.

No appearance for respondents City of Adair Village and Benton County.

Before Rosenblum, Presiding Judge, and Sercombe, Judge, and Carson, Senior Judge.

SERCOMBE, J.

.

### SERCOMBE, J.

Petitioners seek judicial review of an opinion and order of the Land Use Board of Appeals (board) that remands city and county ordinances adopted to expand an urban growth boundary. Petitioners claim that the board erred in not requiring additional justification from the local governments for the urban growth boundary expansion. We conclude that the board's order is unlawful in substance because it failed to require a justification by the local governments of the quantity of land added to the area within the boundary that is necessary under Goal 14.

Respondent JT Smith, Inc., applied to the City of Adair Village and Benton County for comprehensive plan amendments to expand the city's urban growth boundary and to enact plan designations and zoning changes to accommodate the development of high-density residential housing and a school athletic field. The proposed urban growth boundary expansion area is agricultural land that is located south of the city. The city and county approved the application, expanding the urban growth boundary by 142 acres, changing the plan designation of the property from agricultural to high-density residential and open space designations, and amending the zoning for the property from an exclusive farm use zone to zoning districts for urban residential and open space uses. Petitioners appealed the approval ordinances to the board, which reviewed them in a consolidated proceeding. The ordinances included findings adopted to show compliance with state statutes and administrative rules regulating urban growth boundary changes.

Before the board, petitioners argued that the approval findings were insufficient to justify the urban growth boundary amendment in several respects, three of which are relevant to our review. First, petitioners contend that the local governments erred by "failing to demonstrate the need for housing, recreational, and schools lands, as required by Goal 14, prior to expansion of an urban growth boundary." In particular, petitioners asserted that the findings failed to comply with the requirements of Goal 14 to limit urban growth boundary expansions if there is underdeveloped or vacant land already inside the boundary that

can be developed for the desired land uses.[1] Second, petitioners contended that the city and county added too much land to the expansion based on incorrect assumptions about the expected growth in city population and by understating the density of the residential development allowed in the expansion area. Third, petitioners complained about the location of the expansion area, contending that ORS 197.298 foreclosed including agricultural land within the boundary because suitable nonagricultural land was available as an alternative.

The board found that the city's and county's findings improperly discounted the availability of vacant or underdeveloped land for the desired land uses within the existing boundary, contrary to Goal 14 and its implementing rules, and remanded the ordinances to the local governments for further proceedings. But the board rejected petitioners' remaining claims of error. Petitioners seek review of the board's rulings approving the local governments' findings as to the quantity of land to be added to the urban growth boundary area and the location of the expansion.

We review the board's order to determine whether it is "unlawful in substance or procedure." ORS 197.850(9)(a). Petitioners' first assignment of error on review is that the board erred in approving the local governments' calculation of the quantity of land to be added by an urban growth boundary change. The city and county approved a 142-acre expansion to the boundary, designating 118 acres for high-density residential uses and 24 acres for open space uses. The adopted findings forecast a population increase of 1,909 persons during the relevant planning period, a likely household size of 2.75 persons, and a resulting need for 694 additional housing units. The city and county assumed that the average

---

[1] Statewide planning goals, adopted by the Land Conservation and Development Commission under ORS 197.040(2), apply to the adoption or amendment of city or county land use comprehensive plans, including an amendment to adopt or alter an urban growth boundary. ORS 197.175(2)(a) (obligation to adopt and amend comprehensive plans "in compliance with goals approved by the commission"). Goal 14 (Urbanization), OAR 660-015-0000(14), requires that the establishment or change of an urban growth boundary be based on a demonstrated need for additional land. Goal 14 further provides that "[p]rior to expanding an urban growth boundary, local governments shall demonstrate that needs cannot reasonably be accommodated on land already inside the urban growth boundary."

lot size for each housing unit would be 6,000 square feet and, based on that assumption, projected a need to expand the urban growth boundary by 118 acres to accommodate those housing and auxiliary uses. The 694 additional housing units will nearly triple the housing stock in the city from the number of existing dwelling units.

Before the board, petitioners challenged the evidentiary foundation of the finding that land designated and zoned for high-density residential uses would develop at a density of 6,000 square foot lots. Petitioners asserted:

"[B]ecause the land proposed to be added to the UGB would be designated for high-density residential development, no evidence supports an 'average lot size' of 6000 square feet. Minimum lot sizes in the R-3 zone range from 1200 square feet for row houses up to 7600 square feet for duplexes (which would provide two housing units); single family homes may be constructed on lots between a minimum of 3800 square feet and a *maximum* of 6000 square feet."

(Emphasis in original.)

The board rejected petitioners' challenge to the adopted findings on the likely lot size:

"[Respondent] answers that the assumptions used by the city and county are based on policies set forth in the City of Adair Village Comprehensive Plan (Plan). * * * Section 9.800 of the Plan expresses a policy of providing 'new minimum lot sizes that result in an overall average lot size of 6,000 square feet.' Those Plan policies were adopted by the city in February, 2006. It is appropriate for the city and county to rely on assumptions included in the city's acknowledged comprehensive plan policies in computing the acreage for the proposed UGB expansion. *See 1000 Friends of Oregon v. City of Dundee*, 203 Or App 207, 216, 124 P3d 1249 (2005) (an acknowledged comprehensive plan and information integrated into that plan must serve as the basis for land use decisions)."

On review, petitioners complain that the board "seems to have missed the petitioners' point." Petitioners argue that the density of residential development in the expansion area will be controlled by the likely R-3 high-density residential zoning, which sets a maximum 6,000

square foot lot allowance, and not a plan policy espousing a goal of an average lot size for the entire city. In fact, because existing lots in the city are larger than 6,000 square feet, petitioners suggest that new lots in the city must be smaller in order to comply with the plan requirement of an average city-wide lot size of 6,000 square feet. Thus, petitioners conclude that the board order is "unlawful in substance" because it affirmed a critical finding for the calculation of the size of the boundary change that was not supported by substantial evidence in the local government record.

Respondent counters that petitioners failed to preserve those arguments below, that is, that petitioners did not argue to the board that implementation of the "overall average lot size of 6,000 square feet" plan policy requires new lots of less than 6,000 square feet. Respondents conclude that the board correctly relied on the plan policy in upholding the land need calculation.

A party to a review proceeding in this court may not raise a new claim of error that was not preserved in the board proceedings. *Cf.* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court and is assigned as error * * *."); *Citizens Against Irresponsible Growth v. Metro*, 179 Or App 12, 17, 38 P3d 956 (2002) (refusing to consider new claim on review that local government findings failed to show compliance with particular approval criterion).

■ Here, petitioners did preserve their claim that no evidence supported the assumption in the findings that land to be zoned for high-density residential development would develop at lower densities. The assignment of error before the board asserted that the city and county failed to establish the particular need for the quantity of added residential land under Goal 14. Petitioners specifically argued that the likely development would be determined by the high-density residential zoning. Thus, they are free to challenge the contrary determination by the board—that the area will develop instead under a plan policy on average citywide lot sizes. And petitioners can argue that the board's conclusion about the application of the plan policy lacks support in the record. Our policies on preservation of error do not require that a party

anticipate and identify to an agency all the ways that its future decision could be wrong. If a party sufficiently raises an issue before the agency—here, the assertion that the local governments' decision regarding the amount of land to be added is not supported by substantial evidence in the record—the party can challenge the agency decision rejecting that assertion on whatever basis is articulated by the agency order.

We conclude that the board improperly relied on a plan policy about citywide average lot sizes to justify the likely lot size that would be developed in a smaller part of the city. Plan policies or inventories can serve to justify subsequent and related plan amendments because comprehensive plans must be internally consistent under Goal 2.[2] Thus, in *D. S. Parklane Development, Inc. v. Metro*, 165 Or App 1, 994 P2d 1205 (2000), we determined that, in amending its adopted plan pertaining to its urban growth boundary, Metro erred in relying on a draft analysis instead of a study incorporated into the plan on the same topic. Respondent here contends that the urban growth boundary plan amendment in this case must be similarly reconciled to the plan policy on average lot sizes.

Respondent quotes the plan policy in its brief before the board as providing that, "[i]n order to provide for the efficient utilization of residential lands[,] the City will provide for new minimum lot sizes that result in an overall average lot size of 6,000 square feet." The adopted findings reference that policy in the discussion of the need to counterbalance the historical low-density residential development of the city by adding high-density residential land to the urban growth boundary:

"To rectify this imbalance in densities and type the City Council amended its Development Code in 2006 after three

_____

[2] Goal 2 (Land Use Planning), OAR 660-015-0000(2), requires the incorporation of information into a comprehensive plan that is used to make the policy choices in the plan. That "required information shall be contained in the plan document or in supporting documents." The plans, together with their supporting documents, "shall be the basis for specific implementation measures."

years of review to allow for higher densities, multiple family units, and mixed use developments. The new Development Code language provides for a new R-3 zone with lots as small as 1,200 square feet. The Council also adopted new comprehensive plan policies providing for an average lot size of 6,000 square feet. These new zones will provide for a broader mix of housing type, style and cost based on the smaller lots size and allowances for multi-family housing. To assure that development occurs at densities sufficient to accommodate the housing needs without another expansion the City's Code also provides for maximum lot size in the R-3 zone."

The city council did not expressly interpret the meaning of the plan policy in the adopted findings. There is no occasion for board deference to any local government interpretation of its plan under ORS 197.829(1). That statute requires the board to defer to a local government plan interpretation unless the interpretation is inconsistent with the express language, purpose, or underlying policy of the plan provision. To whatever extent the city council implicitly interpreted the policy in the adopted findings, that interpretation is "inadequate for review" under ORS 197.829(2) and does not aid the board's conclusion.

In the absence of any city council interpretation of its plan policy to assist the board, we determine its meaning from the text and context of the policy. By its plain terms and in this context, the average lot size policy directs the content of future zoning legislation (to "provide for new minimum lot sizes"). At the very most, the policy regulates the "overall lot size" within the city. On its face, however, it does not prescribe a 6,000 square foot lot density for any particular development or part of the city.

Assuming that the plan policy on "new minimum lot sizes that will result in an overall average lot size of 6,000 square feet" applies to plan amendments (and not just to zoning legislation on minimum lot sizes), the policy arguably requires that development allowed by an urban growth boundary amendment not result in an average city lot size that is less compliant with the 6,000 square foot standard. The policy does not dictate that the average size of the lots in all new development must be 6,000 square feet. It requires

that lot sizes in new development be arrayed in a way that brings the citywide average lot size closer to the 6,000 square foot standard. If the rest of the city had developed with 10,000 square foot lots, then lots smaller than 6,000 square feet would need to be added to reach an average lot size of 6,000 square feet. But that calculation was not made by the city and county. The adopted findings do not determine what residential density will be required in the expansion area in order to meet the purported plan standard. The plan policy provides no guidance for any assumed residential density without that context.

■        Instead, Goal 14 requires that:

"Establishment and change of urban growth boundaries shall be based on the following:

"(1)   Demonstrated need to accommodate long range urban population, consistent with a 20-year population forecast with affected local governments; and

"(2)   Demonstrated need for housing, employment opportunities, livability or uses such as public facilities, streets and roads, schools, parks or open space, or any combination of the need categories in this subsection (2)."

Goal 14 requires that the quantity of land added to an urban growth boundary be justified by a calculated or "demonstrated" need to add land for housing or other urban uses.

How much land is needed to site 694 dwelling units is a function of how densely the land is developed, which depends, in part, on the residential density permitted by the plan designation and likely zoning. The city plans to use the urbanizing area for high-density residential uses and proposes to zone it accordingly. The necessary justification under Goal 14 of the quantity of land to be added to the urban growth boundary requires a projection of likely development under the densities allowed by the city's high-density residential zoning, the R-3 zoning district, rather than the local governments' assumption that all development will occur under the lowest density permitted by that zoning. That unsupported assumption does not constitute substantial evidence of a "demonstrated need" under Goal 14, and the board's conclusion to the contrary is unlawful in substance.

Petitioners' second assignment of error challenges the board's rulings on their assertion that the local governments insufficiently justified the location of the urban growth boundary expansion. The expansion area is land south of the city that is planned and zoned for agricultural uses. The city chose not to expand the boundary to the west to include the "Tampico Road" exception area, an area that is not designated for agricultural uses. Petitioners argued to the board that the city and county erred in adding agricultural lands to the boundary when nonagricultural land was available to be added, because ORS 197.298 expresses a preference for adding nonagricultural land.

ORS 197.298(1) sets out policies on the priority of land to be added to an urban growth boundary that apply "[i]n addition to any requirements established by rule addressing urbanization." The first priority is land designated as urban reserve land; the second priority is "an exception area," *i.e.*, land determined to be unsuitable for agricultural or forestry uses under criteria set out in Goal 2 and ORS 197.732, or "nonresource land"; the third priority is land designated as marginal land under ORS 197.247; and, if the land under the preceding priorities is "inadequate to accommodate the amount of land needed," the fourth priority is "land designated in an acknowledged comprehensive plan for agricultural or forestry, or both." ORS 197.298(1).

ORS 197.298(3) relaxes the prioritization requirements in certain circumstances. It provides:

"Land of lower priority under subsection (1) of this section may be included in an urban growth boundary if land of higher priority is found to be inadequate to accommodate the amount of land estimated in subsection (1) of this section for one or more of the following reasons:

"(a) Specific types of identified land needs cannot be reasonably accommodated on higher priority lands;

"(b) Future urban services could not reasonably be provided to the higher priority lands due to topographical or other physical constraints; or

"(c) Maximum efficiency of land uses within a proposed urban growth boundary requires inclusion of lower

priority lands in order to include or to provide services to higher priority lands."

The rationale adopted by the city and county for expanding the urban growth boundary to include fourth priority lands under ORS 197.298(1) was that extension of sewer and water services to the exception area would be cost prohibitive because of the need for expensive borings under the state highway; a more efficient transportation system could be engineered on land east of the highway; and the exception area was not configured to accommodate a stated plan objective of "compact community development" and plan growth management policies favoring a "village center" and a transportation system disassociated from the highway. After summarizing the adopted findings, the board determined:

"ORS 197.298(3) allows the city to include resource land within the [Urban Growth Boundary (UGB)] over existing exception areas if urban services cannot reasonably be provided due to physical constraints. Highway 99W physically separates the existing UGB from the Tampico Road exception area, and the evidence in the record indicates that due to the high cost of extending urban services across the highway, those services cannot be reasonably provided to that area. Coupled with the findings that inclusion of the Tampico Road exception area within the UGB would be contrary to adopted Plan policies, we think the findings are sufficient under ORS 197.298(3) to justify the inclusion of lower-priority resource land in the UGB rather than the higher priority Tampico Road exception area."

On review, petitioners categorically contend that the board erred in allowing the addition of any lower-priority land to the urban growth area without proof that the quantity of all types of higher-priority lands was inadequate. That contention is inconsistent with the plain language of ORS 197.298(3) that sets out qualitative considerations for including lower-priority land. We rejected the same contention in *City of West Linn v. LCDC*, 201 Or App 419, 119 P3d 285 (2005). In that case, we concluded that whether there is "inadequate" land to serve a need depends on not only the constraints identified by ORS 197.298(3), but also the criteria for locating an urban growth boundary expansion under Goal 14. The "statutory reference to 'inadequate' land addresses

suitability, not just quantity, of higher priority land." 201 Or App at 440. Thus, the ranking of land under ORS 197.298(1) is a function of its prior classification as urban reserve land, exception land, marginal land, or resource land, as well as the application of the qualitative factors under Goal 14 and ORS 197.298(3).

Petitioners argue that the local governments' determinations that the Tampico Road area is inadequate to meet city needs were insufficient under ORS 197.298(3) in three ways. First, petitioners suggest that the findings on the expense to extend services under the highway are not relevant because Highway 99W is not a "physical constraint" to the provision of urban services under ORS 197.298(3)(b). However, nothing in the text or context of the statute limits "physical constraints" to natural constraints. An artificial barrier to the extension of services, such as the state highway in this case, is nonetheless a physical constraint. The board did not err in concluding that the state highway is a "physical constraint" under ORS 197.298(3)(b).

Petitioners' second contention is that the local government record fails to support the factual conclusion that urban services cannot be reasonably provided to the Tampico Road area. The resolution of that complaint about the sufficiency of the evidence is for the board; our task on review is to determine whether the board correctly applied the "substantial evidence in the whole record" standard in reviewing the city and county land use decisions. ORS 197.835(9)(a)(C). *See Younger v. City of Portland,* 305 Or 346, 358, 752 P2d 262 (1988) ("[W]here LUBA has properly understood and applied the 'substantial evidence' test * * *, a reviewing court should affirm its order * * *."). Our review of the local government records here is not so "at odds with LUBA's evaluation that [we] could infer that LUBA had misunderstood or misapplied its scope of review[.]" *Id.* at 359.

■ Petitioners' final contention is that the findings on plan policies about community form, growth management, and transportation needs are irrelevant to the urban growth boundary expansion decision under ORS 197.298(3), and that the local governments and the board erred in relying on

that part of the justification. Petitioners' contention is incorrect. The findings are relevant to the boundary location factors in Goal 14. Goal 14 requires that the location of an urban growth boundary change be determined by "evaluating alternative boundary locations consistent with ORS 197.298" and with consideration of the following factors:

"(1)  Efficient accommodation of identified land needs;

"(2)  Orderly and economic provision of public facilities and services;

"(3)  Comparative environmental, energy, economic and social consequences; and

"(4)  Compatibility of the proposed urban uses with nearby agricultural and forest activities occurring on farm and forest land outside the UGB."

Those factors allow comparison of needed transportation improvements in the alternative expansion areas as part of the consideration of the "[o]rderly and economic provision of public facilities and services." It is likewise proper to consider the effects of an expansion on compact growth and community form in assessing the "[c]omparative * * * social consequences" of the alternative expansion areas.

Furthermore, we determined in *City of West Linn* that a higher priority of land under ORS 197.298(1) may be "inadequate" because of "the locational considerations that must be taken into account under Goal 14." 201 Or App at 440.[3] For the foregoing reasons, the board did not err in upholding an urban growth boundary expansion decision justified on the qualitative factors in ORS 197.298(3), as well as those in Goal 14.

---

[3] After we decided *City of West Linn*, Goal 14 was amended to explicitly state that the location of an urban growth boundary expansion is to be determined by applying both the Goal 14 locational factors and ORS 197.298 ("location of * * * changes to the boundary shall be determined by evaluating alternative boundary locations consistent with ORS 197.298 and with consideration of" the Goal 14 factors). The Land Conservation and Development Commission adopted OAR 660-024-0060 on October 5, 2006. The effective date of that rule is after the date of the local government decision under review here. However, the rule recognizes the coincident application of the Goal 14 locational factors and ORS 197.298(1) in evaluating urban growth boundary changes.

Thus, the order under review is reversed and remanded as "unlawful in substance" because the board failed to require a justification of the quantity of land needed for high-density residential use that is necessary for the urban growth boundary change to pass muster under Goal 14. The board did not err in upholding a justification of the location of the boundary change based on both ORS 197.298 and Goal 14.

Reversed and remanded.